998 A.2d 589

BOROUGH OF ELLWOOD CITY

v.

PENNSYLVANIA LABOR RELATIONS BOARD.

Appeal of Ellwood City Police Wage and Policy Unit.

Borough of Ellwood City, Appellee

v.

Pennsylvania Labor Relations Board, Appellant.

Supreme Court of Pennsylvania.

Argued March 2, 2009.

Decided July 21, 2010.

Samuel Border Ickes, John Best Neurohr, PA Labor Relations Board, for Pennsylvania Labor Relations Board.

Edward Leymarie Jr., Cusick, Leymarie, DeCaro & Long, P.C., for Borough of Ellwood City.

Christopher Joseph Cimballa, Eric Carl Stoltenberg, Lightman Welby Stoltenberg & Caputo, Harrisburg, for Ellwood City Police Wage and Policy Unit.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

*OPINION*

Justice TODD.

In this appeal by allowance, we consider, *inter alia*, whether a municipal employer must bargain with its police labor organization over a ban on the use of tobacco products in the workplace and in the employer's vehicles and equipment. For the reasons that follow, we conclude, pursuant to the mandates of the Pennsylvania Labor Relations Act ("PLRA")[1] and the Collective Bargaining by Policemen and Firemen Act, commonly known as Act 111 ("Act 111"),[2] a municipal employer's ban on the use of tobacco products by members of the police labor organization is a mandatory subject of bargaining and is not an inherent managerial prerogative; thus, the municipal employer must bargain with the labor organization over such a ban. Therefore, we reverse the order of the Commonwealth Court.

The facts underlying this appeal are not in dispute. The Ellwood City Police Wage and Policy Unit (the "Union") is the exclusive bargaining representative of a unit of police officers employed by Ellwood City Borough (the "Borough"). Prior to June 19, 2006, the Borough permitted its police officers to smoke and use tobacco products in its buildings, vehicles, and equipment. On June 19, 2006 the Borough Council passed a resolution prohibiting the use of all tobacco products on or in Borough-owned buildings, vehicles, and equipment. The next day, the Borough's Mayor, Donald Clyde, issued a memorandum to all Borough employees, including the police officers at issue in this appeal, mandating them to comply with the resolution. Later, on August 21, 2006, the Borough's Council adopted Ordinance # 2397 (the "Ordinance") which was identical to the June 19 resolution.[3] The Borough did not bargain

1. Act of June 1, 1937, P.L. 1168, No. 294 (as amended, 43 P.S. §§ 211.1–211.3).

2. Act of June 24, 1968, P.L. 237, No. 111 (as amended, 43 P.S. §§ 217.1–217.10).

3. The Ordinance states:

with the Union over the tobacco products prohibition before directing police officers to comply with the ban.

After the passing of the resolution, on July 13, 2006, the Union filed a charge of unfair labor practice with the Pennsylvania Labor Relations Board (the "Board" or the "PLRB"), in which it alleged, as discussed more fully below, that the Borough's unilateral implementation of the ban on the use of tobacco products violated the Borough's duty to collectively bargain, as mandated by Section 6(1)(a) and (e) of the PLRA and Act 111. *See* 43 P.S. § 211.6(1)(a) and (e). On August 4, 2006, the Secretary of the Board issued a Complaint and Notice of Hearing. On September 28, 2006, a hearing was held before Hearing Examiner Donald Wallace.

Hearing Examiner Wallace issued a Proposed Decision and Order, in which he concluded the Borough's unilateral implementation of the ban on the bargaining unit members' use of all tobacco products violated the Borough's statutory duty to bargain with the Union. The Borough filed exceptions on January 5, 2007. On February 20, 2007, the Board issued a Final Order which dismissed the exceptions and affirmed the Proposed Decision and Order. Thereafter, the Borough filed a Petition for Review with the Commonwealth Court, and the Union was granted permission to intervene in the appeal.

On appeal, a majority of the *en banc* Commonwealth Court vacated the Board's order denying the Borough's exceptions. *Borough of Ellwood City v. PLRB*, 941 A.2d 728 (Pa.Cmwlth.

WHEREAS, various studies have demonstrated the danger of tobacco products to users and persons affected second hand by the use of tobacco;

WHEREAS, indicators show tobacco use is rising dramatically;

WHEREAS, it is the desire of the Council of the Borough of Ellwood City to provide a tobacco free environment on and in all municipally owned buildings, vehicles and equipment to promote the health and welfare of its employees and citizens.

NOW THEREFORE BE IT ORDAINED, as follows:

1. The use of all tobacco products on or in Borough owned buildings, vehicles and equipment is forbidden.
2. Any person found guilty of violating any provision of this Resolution shall be subject to a fine not to exceed $300.00.

Borough of Ellwood City, Pennsylvania Ordinance #2397, R.R. at 122a.

2008). Specifically, in an opinion authored by Judge Doris Smith–Ribner, the majority initially considered the issue of whether the Clean Indoor Air Act of 1988, 35 P.S. § 1230.1 et seq., preempted the Ordinance.[4] The Commonwealth Court majority rejected an interpretation that all local regulation of indoor tobacco use is preempted under the Clean Indoor Air Act of 1988. *Borough of Ellwood City*, 941 A.2d at 734–35. Having resolved this threshold issue, the majority then addressed whether the Ordinance implicated a mandatory subject of bargaining. First, the court found the enactment of the Ordinance was an exercise of the Borough's general police power, concluding that the purpose of the legislation was driven by the Borough's acknowledgment of the dangers of tobacco products to users and to persons affected by second hand tobacco use and the desire to provide a tobacco free environment on and in all municipality owned buildings, vehicles, and equipment to promote the health and welfare of its employees and citizens. *Id.* at 735–36.

Finding the Borough had authority pursuant to its delegated police powers to adopt measures designed to promote the health and welfare of all of its citizens, the majority found the ban on the use of tobacco products in specific locations to be related to entrepreneurial or managerial judgments fundamental to the basic scope and direction of the Borough, as the ban related to the Borough's overarching policy of protecting and promoting the general health and welfare of its citizens. Therefore, the majority concluded that, in light of the fundamental concern relating to the direction of the municipality, the interest of the Borough overcame the interest of the employees in maintaining the prior practices related to tobacco use, and the new ban on tobacco use was not subject to mandatory collective bargaining. *Id.* at 736. Accordingly, the Commonwealth Court majority held the Board erred in dismissing the Borough's exceptions and reversed the Board's order.

4. The Clean Indoor Air Act of 1988 was repealed by the Clean Indoor Air Act of 2008.2008, June 13, P.L. 182, No. 27, § 1 (35 P.S. §§ 637.1–637.11) (the "Clean Indoor Air Act of 2008"). ·

Judge Bernard McGinley dissented, finding the change in the policy concerning the use of tobacco was a mandatory subject of bargaining and the ban on tobacco use was a condition of employment that was not a "managerial prerogative" essential to the Borough's mission. *Id.* at 737. Similarly, Judge Dan Pellegrini in his dissent, opined that, while the Borough, through the Ordinance, could ban smoking in public places, it could not prohibit the use of tobacco in non-public places without first negotiating with the Union. Judge Pellegrini offered that the Ordinance was not enacted pursuant to the Borough's general police powers, but, rather, through its proprietary power to control conduct that takes place on its property. *Id.* at 738. As the Clean Indoor Air Act of 1988 authorized proprietors or the person in charge of public places to ban everyone from smoking, the matter of a public ban was removed from collective bargaining, he concluded. Here, however, the Borough imposed a ban in non-public places, and, thus, it had an obligation to negotiate over whether tobacco products could be used in those non-public areas, as this affects only employees. *Id.* Judge Pellegrini deemed the tobacco use policy to be a term and condition of employment; accordingly, it was a mandatory subject of bargaining. In Judge Pellegrini's view, "[o]bviously, a public employer cannot circumvent bargaining with the Union over terms and conditions of employment simply by passing an ordinance." *Id.*

The Board and Union sought this Court's discretionary review, which was granted on October 1, 2008.[5] *Borough of Ellwood City v. Pennsylvania Labor Relations Board*, 598 Pa. 535, 958 A.2d 492 (2008) (order). In our order, we reframed the issues on appeal for clarity:

(a) May a municipality, pursuant to its general police powers, enact an ordinance barring the use of tobacco products in publicly owned buildings, including employee workplaces inaccessible to the public at large, without negotiating with the exclusive representative of its employees?

5. We have jurisdiction over this appeal pursuant to 42 Pa.C.S.A. § 724(a).

(b) Must a municipal employer bargain with the police labor organization over the ban on use of tobacco products in the workplace and in the employer's vehicles and equipment? *Id.*

 As a threshold matter, we consider the proper standard and scope of review. As a general proposition, when reviewing a decision of the Board, our review is limited to determining whether there has been a violation of constitutional rights, an error of law, procedural irregularity, or whether the findings of the agency are supported by substantial evidence. 2 Pa.C.S.A. § 704; *FOP and Conf. of Liquor Control Bd. Lodges v. PLRB*, 557 Pa. 586, 592, 735 A.2d 96, 99 (1999). Furthermore, it is well settled that a decision of the Board must be upheld if the Board's factual findings are supported by substantial evidence, and if conclusions of law drawn from those facts are reasonable, not capricious, arbitrary, or illegal. *Joint Bargaining Committee of Pennsylvania Social Services Union v. PLRB*, 503 Pa. 236, 241, 469 A.2d 150, 152 (1983). Related thereto, an administrative agency's interpretation of a governing statute is to be given controlling weight unless clearly erroneous. *Whitaker Borough v. PLRB*, 556 Pa. 559, 562, 729 A.2d 1109, 1110 (1999). Finally, we have acknowledged that our Court "will not lightly substitute its judgment for that of a body selected for its expertise whose experience and expertise make it better qualified than a court of law to weigh facts within its field." *Appeal of Cumberland Valley School District*, 483 Pa. 134, 140, 394 A.2d 946, 949 (1978) (citing *PLRB v. Butz*, 411 Pa. 360, 377, 192 A.2d 707, 716 (1963)). Our scope of review is plenary in that we can consider the entire record. We now turn to resolution of the issues before us.

By way of background, the General Assembly enacted the PLRA in 1937 during a time of great labor unrest and in response to its findings that individual employees working in the private sector lacked full freedom of association and actual liberty of contract, as well as an inequality of bargaining power, which substantially and adversely affected the welfare of the Commonwealth. 43 P.S. § 211.2. This adverse effect on

the public welfare included "strikes, lock-outs, and other forms of industrial strife and unrest, which are inimical to the public safety and welfare, and frequently endanger the public health." *Id.* The PLRA set forth the rights and responsibilities of employers and employees covered by the statute. Through the PLRA, the legislature granted private sector employees the statutory right, *inter alia,* "to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing." 43 P.S. § 211.5. Section 7(a) of the PLRA, in turn, mandates bargaining between an employer and a union over wages, hours, and other conditions of employment:

> (a) Representatives designated or selected for the purposes of collective bargaining by the majority of employes in a unit appropriate for such purposes, shall be the exclusive representatives of all the employes in such unit **for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment:** Provided, That any individual employe or a group of employes shall have the right at any time to present grievances to their employer.

43 P.S. § 211.7(a) (emphasis added). Indeed, under the PLRA, an employer commits an unfair labor practice if it refuses to collectively bargain with a union representing its employees over these mandatory topics. Specifically, Section 6(1)(a) and (e) of the PLRA provide:

> **(1) It shall be an unfair labor practice for an employer—**
>
> (a) To interfere with, restrain or coerce employes in the exercise of the rights guaranteed in this act.
>
> * * *
>
> ■ (e) **To refuse to bargain collectively with the representatives of his employes,** subject to the provisions of section seven (a) of this act.

43 P.S. § 211.6(1)(a) and (e). Therefore, an employer's unilateral change of a condition of employment—i.e., a mandatory subject of bargaining—without first negotiating with the un-

ion, interferes with the employees' collective bargaining rights, and thus, constitutes an unfair labor practice.

Contrary to the rights of private sector employees as protected by the PLRA, public employees were prohibited from striking and enjoyed no collective bargaining rights during the first half of the 20th Century. *Pennsylvania State Police v. Pennsylvania State Troopers' Ass'n (Betancourt)*, 540 Pa. 66, 76–77, 656 A.2d 83, 88–89 (1995). Ten years after passing the PLRA, however, the General Assembly enacted the Act of June 30, 1947, P.L. 1183, § 1 et seq., in an attempt to quell increased concerns over disruptive work stoppages in the public sector. *Township of Moon v. Police Officers of the Township of Moon*, 508 Pa. 495, 502, 498 A.2d 1305, 1308 (1985). While this legislation prohibited strikes and granted employees the right to resolve grievances through negotiations, there was no provision for the essential right of collective bargaining as to terms and conditions of employment. The Act of 1947, however, failed to secure peace in the public employment arena, and, by the late 1960's, it was accepted that the right to collectively bargain as to terms and conditions of employment should be granted to public employees. *Id.*

In 1968, in the face of illegal strikes and labor unrest in the public sector, the General Assembly passed Act 111, which permitted police and fire personnel the right of collective bargaining: "The law relating to police and fire personnel, whose services are so vital to an ordered society ... was created to strike a more perfect balance between the need of the Commonwealth to insure public safety and the rights of the worker." *Betancourt*, 540 Pa. at 77, 656 A.2d at 89. Like the PLRA,[6] central to the rights created by Act 111 was the employees' ability to "have the right to bargain collectively with their public employers concerning the terms and conditions of their employment, including compensation, hours, working conditions, retirement, pensions and other benefits,

6. Act 111 and the PLRA are to be read in *pari materia*. *Gehring v. PLRB*, 591 Pa. 574, 580 n. 7, 920 A.2d 181, 185, n. 7 (2007); *Philadelphia Fire Officers Ass'n v. PLRB*, 470 Pa. 550, 369 A.2d 259 (1977).

and ... the right to an adjustment or settlement of their grievances or disputes in accordance with the terms of this act." 43 P.S. § 217.1. Due to the essential services performed by these employees, they were not permitted to strike. As a *quid pro quo* for the denial of this ability, however, Act 111 permitted binding arbitration to resolve an impasse in negotiations.[7]

Thus, Act 111 came to pass as a result of significant labor instability within the public safety labor forces of the Commonwealth, and the importance of collective bargaining over the terms and conditions of their employment cannot be understated. As our Court stated in *Township of Moon,* "the General Assembly was committed to the view that the right to collective bargaining over terms and conditions of employment was critical to the restoration and maintenance of harmony in the public employment sector." *Township of Moon,* 508 Pa. at 503, 498 A.2d at 1309.

With this background in mind, we next consider the arguments of the parties. The Board offers a number of reasons why the Commonwealth Court's decision should be overturned. First, the Board contends the Borough violated its duty to collectively bargain by unilaterally implementing its ban on its police officers' use of all tobacco products in Borough-owned buildings, vehicles, and equipment. The Board offers that, outside of the school setting, the Commonwealth Court decisional law has held a ban on the use of tobacco products is a mandatory subject of bargaining. Additionally, the Board submits that, in coming to its conclusion, the Commonwealth Court utilized an incorrect test in determining whether a topic is a managerial prerogative and not subject to bargaining. Specifically, the Board points out that, under Act 111, a matter is deemed to be bargainable if it bears a "rational relationship" to employee duties. Only a topic in which an employer's interest substantially outweighs the inter-

7. In 1970, remaining public employees were given the right to collectively bargain under the Pennsylvania Employe Relations Act ("PERA" or "Act 195"). Act of July 23, 1970, P.L. 563, No. 195, § 101 (43 P.S. § 1101.101 et seq.).

ests of the employees will be deemed to be a managerial prerogative, and, thus, not subject to mandatory bargaining. According to the Board, the Commonwealth Court merely determined that the interest of the Borough "overcomes" that of the employees in weighing the competing interests.

Furthermore, the Board argues that the Commonwealth Court failed to address the issue of whether the ban on police officer tobacco use was overbroad and not narrowly tailored to address the Borough's interest in protecting the public from the hazards of tobacco smoke. Related thereto, the Board asserts that a municipality may not avoid its bargaining obligation under the guise of passing an ordinance. Finally, while the Board maintains that bargainable items are excluded from mandatory bargaining where other applicable statutory provisions explicitly and definitively prohibit the employer from making an agreement as to that specific term or condition of employment, here, neither the Borough Code nor the Clean Indoor Air Act of 1988 explicitly and definitively prohibited bargaining over the police officers' use of tobacco products. In fact, the Clean Indoor Air Act of 1988 specifically stated that "nothing in this section or any local law, rule or regulation shall be construed as to impair or diminish or otherwise affect any contractual agreement, collective bargaining agreement, collective bargaining rights or collective bargaining procedures." 35 P.S. § 1230.1(g).

In addition to supporting the arguments of the Board, the Union adds that, as noted above, the Clean Indoor Air Act of 2008 repealed the 1988 statute after the Commonwealth Court's decision in this matter.[8] The Clean Indoor Air Act of 2008 imposes new statewide bans on smoking in public places, which includes public facilities, employee workplaces, and vehicles of mass transit. 35 P.S. §§ 637.2, 637.3.[9] The Union does

8. *See supra* note 4.

9. The Clean Indoor Air Act of 2008 provides in relevant part:

not challenge this legislation, but submits that the Clean Indoor Air Act of 2008 does not terminate this appeal, as it challenges the Borough's unilateral ban on the use of smokeless tobacco in the officers' work areas, including the public Borough building, the non-public police department, and the Borough's vehicles and equipment as well as smoking in vehicles that are not used for mass transit and equipment. Moreover, the Union reasons that a municipality may not escape its bargaining obligations merely by declaring them to be an exercise of general police powers to provide for the public good and offers that the General Assembly created collective bargaining obligations through the Commonwealth's police power to provide for public health and safety. The Union emphasizes that there is nothing concerning the tobacco ban that is essential to the efficient functioning of the police department, and, thus, the topic is not a management prerogative that would not be subject to collective bargaining.

The Borough's position is limited, asserting that it may adopt measures under its police power for the health safety, morals, and general welfare of the citizens of the Borough. 53 P.S. § 46202(6), and it did so by enacting the Ordinance. In the preamble to the Ordinance, the Borough acknowledged the danger of tobacco products to users and the dangers from secondhand smoke. According to the Borough, the Ordinance does not ban police officers from smoking while on duty; it

> (a) General rule.—[A]n individual may not engage in smoking in a public place.
>
> \* \* \*
>
> "Public Place." An enclosed area which serves as a workplace, commercial establishment or an area where the public is invited or permitted. The term includes:
>
> \* \* \*
>
> (2) A vehicle used for mass transit
>
> \* \* \*
>
> (4) A public facility. This paragraph includes a facility to which the public is invited or in which the public is permitted and a private home which provides child-care or adult day-care services.
>
> \* \* \*
>
> "Workplace." An indoor area serving as a place of employment, occupation, business, trade, craft, professional or volunteer activity. 35 P.S. §§ 637.3, 637.2.

merely regulates smoking in central public places. The Borough seemingly equates the Ordinance's ban on the use of all tobacco products with a ban on smoking, as it takes the view that the enactment of the Clean Indoor Air Act of 2008 has rendered the issue moot.

Having set forth the parties' arguments, we address whether a ban on the use of tobacco products is a mandatory subject of bargaining or whether it constitutes an inherent managerial prerogative such that it is excised from collective bargaining obligations.

█ Initially, it is important to note the Union acknowledges that the General Assembly, through the Clean Indoor Air Act of 2008, imposed statewide bans on smoking in a public place, which includes employee workplaces and vehicles of mass transit. 35 P.S. § 637.2; § 637.3. Thus, at issue in this appeal is only the Union's contention that the Borough failed to bargain over the aspects of its ban not covered by the Clean Indoor Air Act of 2008, i.e., the use of smokeless tobacco in police officers' work areas, and Borough vehicles and equipment, and smoking in vehicles that are not used for mass transit and equipment.[10] Therefore, as limited to these discrete areas, we find that the appeal is not moot, but note our opinion today is limited to these specific areas of controversy.

█ As described above, pursuant to Act 111, a governmental employer and a union are required to bargain over mandatory subjects of bargaining. Whether a topic constitutes a mandatory subject of bargaining, which includes working conditions, is an important threshold determination. Once it has been determined that a particular subject involves a working condition, an employer's unilateral change of such working condition violates its statutory duty to bargain and, thus, constitutes an unfair labor practice. Act 111 does not define working conditions. We believe what constitutes working

10. As the parties recognize and agree upon the impact of the Clean Indoor Air Act of 2008 regarding smoking in public places on their duty to bargain, this aspect of the appeal is now moot.

conditions is not capable of easy definition and is necessarily imprecise in order to capture the differing environments that exist at various workplaces. We can safely say, however, that the concept is a broad one. Indeed, it has been suggested that bargainable matters are those that bear a "rational relationship" to the employees' duties. *See Plumstead Township v. PLRB*, 713 A.2d 730, 733 (Pa.Cmwlth.1998). Stated another way, working conditions are those subjects "germane" to the working environment. *See Crawford County v. PLRB*, 659 A.2d 1078, 1081 (Pa.Cmwlth.1995) *(citing Ford Motor Co. (Chicago Stamping Plant) v. NLRB*, 441 U.S. 488, 498, 99 S.Ct. 1842, 60 L.Ed.2d 420 (1979) ("availability of food during working hours and the conditions under which it is to be consumed are matters of deep concern to workers, and one need not strain to consider them to be among those 'conditions' of employment that should be subject to the mutual duty to bargain.")). It does not cover, however, as discussed below, inherent managerial policy decisions. *Crawford County*, 659 A.2d at 1081.

While our Court has not considered whether a ban on tobacco usage is a working condition, and, thus, a mandatory subject of bargaining, our Commonwealth Court has considered this issue on a number of occasions. Over 25 years ago in *Commonwealth of Pennsylvania v. PLRB (Venango County Board of Assistance)*, 74 Pa.Cmwlth. 1, 459 A.2d 452 (1983), the Commonwealth Court concluded that, under PERA, a unilateral ban on tobacco smoking by employees of the Venango County Board of Assistance constituted an unfair labor practice, as the issue of whether employees could smoke at their workplaces implicated working conditions, and, thus, was a mandatory subject of bargaining. Over ten years later, the Commonwealth Court had the opportunity to reconsider its prior holding and came to the same conclusion. Specifically, in *Crawford County, supra,* the court reasoned that smoking was a privilege germane to the working environment, and the County had committed an unfair labor practice by implementing a no smoking policy in its jail without first bargaining with

the union.[11]

██ We agree with prior Commonwealth Court decisions which have concluded that employee tobacco use at his or her place of employment is germane to the employee's work environment; thus, it is properly described as a working condition. While tobacco use may not be important to certain workers and has been proven to be deleterious to one's health, a policy on tobacco use nonetheless is a part of the environment in which tobacco users work. Therefore, as a general matter, we find under Act 111, an employer's restrictions on employee tobacco use at work are subject to mandatory collective bargaining.[12]

This does not conclude our analysis, however, as matters that constitute working conditions may also implicate matters of inherent managerial prerogative, which are not subject to collective bargaining. It is not difficult to envision an overlap between those subjects which impact police and fire personnel, falling under the broad topics of wages, hours, or working conditions, and, thus, which are ostensibly subject to mandatory collective bargaining, and those subjects which implicate matters which are managerial in nature and implicate significant policy concerns. While Act 111 requires bargaining over working conditions, 43 P.S. § 217.1, it is silent as to any

11. We note that in *Chambersburg Area School District v. PLRB*, 60 Pa.Cmwlth. 29, 430 A.2d 740 (1981), the Commonwealth Court found that a school district's unilateral ban on smoking did not constitute an unfair labor practice. The engine that drove that decision, however, was the unique characteristics of the school district as a public education institution. The court recognized the import of educational employees serving as role models to students. We believe that the nature of public schools and their vital mission of educating our youth significantly differs from that of municipal governance. We simply do not find sufficiently similar characteristics of the two enterprises to embrace the rationale espoused in *Chambersburg Area School District* for purposes of the appeal *sub judice*. It is on this basis that we find the decision in *Chambersburg Area School District* to be clearly distinguishable.

12. Our conclusion today is buttressed by the federal labor law experience, which has found that the topic of a smoking ban must be submitted to the union for bargaining. *See, e.g., W–I Forest Products Co.*, 304 NLRB 957 (1991); *Chemtronics, Inc.*, 236 NLRB 178 (1978); *Alberts Inc.*, 213 NLRB 686 (1974).

limitation on bargaining over topics that constitute managerial decisions. None of the parties, however, contest such a limitation, and case law confirms that, under Act 111, managerial prerogatives are not subject to collective bargaining. *See, e.g., Schuylkill Haven Borough v. Schuylkill Haven Police Officers Ass'n,* 914 A.2d 936, 941 (Pa.Cmwlth.2006); *F.O.P. Rose of Sharon Lodge No. 3 v. PLRB,* 729 A.2d 1278, 1281–82 (Pa.Cmwlth.1999).

Furthermore, although not implicated herein, we note that PERA contains an express limitation on these topics, stating, "public employers shall not be required to bargain over matters of inherent managerial policy." 43 P.S. § 1101.702. Such topics include, but are not limited to, "such areas of discretion or policy as the functions and programs of the public employer, standards of services, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel." *Id.* Moreover, it is common sense that the salutary prohibition on bargaining over inherent managerial prerogatives stems in part from the nature of the government as an employer. Not only do certain topics concern subjects which are essential to an employer's managing of its employees and the running of its enterprise, but also there are certain matters which strike at the heart of policy decisions that directly implicate the public welfare, and, thus, should be insulated from the give-and-take of collective bargaining. As we stated in *PLRB v. State College Area Sch. Dist.,* 461 Pa. 494, 499–500, 337 A.2d 262, 264 (1975), "public employers are custodians of public funds and mandated to perform governmental functions as economically and effectively as possible. The employer in the private sector is constrained only by investors ... whereas the public employer must adhere to the statutory enactments which control the operation of the enterprise." Further, "there will be issues that would be fully legitimate in the context of a private sector labor dispute which will not be legitimate in the context of a public sector labor dispute. Public employers are in many respects more limited in what they may do vis-à-vis their employees, and those limitations must be maintained." *Wash-*

*ington Arbitration Case,* 436 Pa. 168, 177, 259 A.2d 437, 442 (1969).

Based upon these bedrock notions of governmental responsibilities concerning the public, similar labor statutes, and prior precedent, we have no hesitation in recognizing that, although Act 111 does not speak to limitations on collective bargaining over subjects which implicate managerial prerogatives, matters which involve inherent managerial prerogatives are not subject to mandatory collective bargaining.

In resolving whether a particular topic is an inherent managerial prerogative, no clear test has evolved.[13] Consistent with the history of Act 111, as well as the above-stated policy concerns, when addressing topics which straddle the boundary between ostensibly mandatory subjects of bargaining and managerial prerogatives, we believe once it is determined that, as here, the topic is rationally related to the terms and conditions of employment, i.e., germane to the work environment, the proper approach is to inquire whether collective bargaining over the topic would unduly infringe upon the public employer's essential managerial responsibilities. If so, it will be considered a managerial prerogative and non-bargainable. If not, the topic is subject to mandatory collective bargaining. We find this inquiry regarding subjects of bargaining and managerial prerogatives to embrace both the

**13.** In the context of Act 111, the Commonwealth Court has at times employed a weighing paradigm in which, if a managerial policy "substantially outweighs" the impact the issue will have on employees, it will not be subject to collective bargaining. *See Schuylkill Haven Borough,* 914 A.2d at 941. On other occasions, the court has eschewed a balancing approach and simply concluded that a particular topic directly impacts the public employer's managerial prerogative. *See Int'l Ass'n of Fire Fighters, Local 669 v. City of Scranton,* 59 Pa.Cmwlth. 235, 429 A.2d 779, 781 (1981). Furthermore, under PERA, our Court has offered that "where an item of dispute is a matter of fundamental concern to the employes' interest in wages, hours and other terms and conditions of employment, it is not removed as a matter subject to good faith bargaining under section 701 simply because it may touch upon basic policy." *State College Area Sch. Dist.,* 461 Pa. at 507, 337 A.2d at 268. Rather, it is to be determined "whether the impact of the issue on the interest of the employe in wages, hours and terms and conditions of employment outweighs its probable effect on the basic policy of the system as a whole." *Id.*

rights of police and fire personnel and the unique needs of public employers.

Applying this test, we note that no one disputes that, prior to the Ordinance, Borough police officers were permitted to smoke and use other tobacco products in Borough buildings, vehicles, and equipment. Additionally, as determined above, tobacco usage in the workplace is germane to the work environment. Furthermore, we find that the topic of workplace tobacco usage is unlike those significant core entrepreneurial topics that are more naturally considered to be inherently managerial in nature such as decisions regarding the programs of the employer, standards of service, overall budget, use of technologies, organizational structure, and selection and direction of employees. *See* 43 P.S. § 1101.702. Thus, we conclude that collective bargaining over the policy regarding tobacco usage does not unduly infringe upon the employer's inherent managerial decision making. Therefore, in these circumstances, the Borough's ban on tobacco products was not a managerial prerogative, and, thus, was subject to mandatory collective bargaining. *See Crawford County,* 659 A.2d at 1081–82 (finding ban on smoking in jail to be a mandatory subject of bargaining and rejecting the argument that policy concerns relating to health and second hand smoke and possible fire hazard rendered the topic a managerial prerogative); *Commonwealth of Pennsylvania,* 459 A.2d at 455 (determining workplace smoking was "at the center of those subjects properly described as 'conditions of employment' and to be entirely unrelated to those entrepreneurial or managerial judgments fundamental to the basic direction of the enterprise"); *see also Dep't of Health and Human Serv. v. FLRA,* 920 F.2d 45, 47–8 (D.C.Cir.1990) (concluding mission to educate public about dangers of smoking was not compelling need that rendered ban on smoking in workplace non-bargainable under Federal Service Labor–Management Relations Act, 5 U.S.C. § 7101 et seq.).

Our conclusion that the Borough's ban on tobacco is a working condition, and not a managerial prerogative, is not altered by the means by which the Borough implemented the

ban—through the enactment of the Ordinance. The Borough asserts, and the Commonwealth Court majority found, Section 1202(6) of the Borough Code permits a borough to make "such regulations as may be necessary for the health, safety, morals, general welfare and cleanliness and the beauty, convenience, comfort and safety of the borough." 53 P.S. § 46202(6). Thus, according to the Borough, it may, under its specifically delegated police power, adopt measures to protect its citizens' health and welfare, and this authority constitutes a managerial right that is non-bargainable.

We find the Borough's argument, and the Commonwealth Court's holding, fail to appreciate the relationship between municipal governance and the Commonwealth's labor policy. First, while the Borough Code may represent the policy of the Commonwealth to permit municipal entities the ability to protect the health and welfare of its citizenry, the policy of the Commonwealth is also plainly reflected in the passing of the PLRA and Act 111. Act 111, passed two years after the Borough Code, clearly establishes the rights of police and fire personnel to engage in meaningful collective bargaining. Its provisions apply to every political subdivision in the Commonwealth. 43 P.S. § 217.9. As detailed above, this exercise of the Commonwealth's police power through the passage of Act 111 was prompted by the desire to protect the health, safety, and welfare of the Commonwealth and its citizens. Furthermore, this specific exercise of the Commonwealth's police power through the granting of collective bargaining rights is not subservient to ordinances created through general police power. To sharpen the point, the Borough Code also endows a municipality with the authority to create a police department, to fix weekly hours of police officers, to remove or suspend police officers, and to fix their compensation. 53 P.S. §§ 46121, 46125. Yet, it cannot be seriously suggested that this authority precludes mandatory collective bargaining over wages, hours of work, and conditions of employment. Indeed, if this were the case, a borough could eviscerate the very essence of statutorily-mandated collective bargaining by legislating in areas which are traditionally subject to mutual agree-

ment through collective bargaining under its power to regulate the health, safety, and general welfare of its citizens. This would invite the very unrest in the public sector that Act 111 was enacted to alleviate. We cannot conclude that this is the intent of the General Assembly.

Resolving the tensions between a municipality's passage of an ordinance under its police powers and its impact upon collective bargaining obligations pursuant to Act 111 is a case-specific inquiry. Therefore, turning to the legislation at issue, the Ordinance before us is in some respects narrow and in others broad. In one instance, the Ordinance is circumscribed in that the Borough does not attempt to regulate tobacco usage in general to protect the health and welfare of its citizens, but only does so in certain limited areas. Yet, in other respects the Borough's actions are broad in that the Ordinance goes beyond protecting the public as it applies to both public and non-public areas of Borough property. Moreover, the Borough not only bans smoking, which certainly implicates the public health, it also prohibits the use of smokeless tobacco products which, at least on this record, does not appear to implicate the health of the public.

Based upon the foregoing, we hold that the employees' collective bargaining rights under the PLRA and Act 111 do not interfere with the Borough's authority to pass such local legislation to the extent it bans tobacco use in public places. We also conclude, however, that the Ordinance, which unilaterally bans all use of all tobacco in certain non-public areas—such as smokeless tobacco use in police officer's non-public work areas and Borough vehicles and equipment, and smoking in Borough vehicles not used for mass transit and equipment—impermissibly denied Borough police officers their statutorily-guaranteed collective bargaining rights under the PLRA and Act 111 to negotiate over working conditions. We find the Borough's enactment of the Ordinance with respect to non-public areas is in conflict with the principle that a municipality may not avoid its collective bargaining obligations through the passing of an ordinance. *See Borough of*

*Geistown v. PLRB,* 679 A.2d 1330, 1333 (Pa.Cmwlth.1996). We must reconcile the ability of the Borough to enact legislation protecting the health, safety, and general welfare of its citizens with the rights of Borough police officers to engage in collective bargaining. In doing so, we conclude that, while local legislation which promotes clean air and warns of the risks of tobacco use may be laudatory, it may not serve as a barrier to negotiations over this topic when it constitutes a working condition subject to mandatory bargaining under Act 111. *See Lebanon County Detectives Ass'n. v. Lebanon County,* 27 PPER ¶ 27,260 (Final Order 1996).[14]

For the reasons stated above, we reverse, in part, the order of the Commonwealth Court. Jurisdiction relinquished.

Former Justice GREENSPAN did not participate in the decision of this case.

Chief Justice CASTILLE and Justices SAYLOR, EAKIN and BAER join the opinion.

Justice McCAFFERY files a concurring opinion.

Justice McCAFFERY.

I join in the majority's conclusion that the order of the Commonwealth Court must be reversed because a municipality's ban on the use of tobacco products by members of a municipality's police labor organization is a mandatory subject of bargaining. Further, I join in, and applaud, the majority's determination that the Borough Code does not trump the provisions of Act 111, although, as I shall explain *infra,* I do

14. We emphasize the Union seeks only the right to collectively bargain over the Borough's ban of the use of smokeless tobacco in police officer work areas, Borough vehicles and equipment, and smoking in vehicles that are not used for mass transit, and equipment. As a practical matter, and in light of our increasingly smoke-free society, a majority of the employees in the bargaining unit represented by the Union may very well endorse a ban on tobacco use in these areas. Furthermore, even if there is not majority support for a total ban on tobacco use, negotiations may involve the accommodation of non-tobacco users. Again, the Union is seeking only to guarantee the statutorily-based rights of its police officers to engage in collective bargaining over this topic.

not join in the majority's determination that courts, on a case-by case basis, must determine whether an ordinance may remove terms and conditions of employment of Act 111 employees from the bargaining table.

For the reasons set forth in my concurring and dissenting opinion in *City of Philadelphia v. International Ass'n of Firefighters Local 22*, 606 Pa. 447, 999 A.2d 555 (2009) (McCaffery, J., concurring and dissenting), I respectfully cannot fully join in the majority's analysis. Where the majority has "no hesitation in recognizing that, although Act 111 does not speak to limitations on collective bargaining over subjects which implicate managerial prerogatives, [such matters] are not subject to mandatory collective bargaining,"[1] my hesitation in this matter is significant. In my concurring and dissenting opinion in *City of Philadelphia*, I express my concern that because Act 111, unlike the Public Employee Relations Act ("PERA"),[2] is silent on the issue of "managerial prerogatives," recognition by this Court of a robust "managerial prerogatives" component in Act 111 will cause a series of great harms. Chief among these is the effective and impermissible enlargement of the narrow *certiorari* scope of review, a result completely contrary to our previous case law. Further, I express my opinion that this Court's insertion into Act 111 of a "managerial prerogatives" component that invites judicial review regarding the limits of an Act 111 interest arbitration panel's consideration of disputes involving undisputed "terms and conditions of employment," effectively rewrites Act 111, does violence to Sections 1 and 7 of that act, and is contrary to Act 111's purposes as repeatedly observed by this Court's previous case law.

Further, I respectfully believe that in this case, the majority's casual borrowings from PERA and case law interpreting that act are made without any analysis concerning the specific texts of each of the two acts, the similarities of and differences between the classes of individuals covered by these acts, or

1. Op. at 373–75, 998 A.2d at 599–601.
2. Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. §§ 1101.101–1101.2301.

the legislative intent behind the establishment of each of these acts.[3] Additionally, the majority completely fails to take into account how the "linchpin" of Act 111—its "no appeal" mandate—would fare under the majority's analysis of and approach to Act 111. *See Pennsylvania State Police v. Pennsylvania State Troopers' Ass'n (Betancourt)*, 540 Pa. 66, 656 A.2d 83, 89 (1995) (recognizing that because the services of "police and fire personnel ... are so vital to an ordered society," and the "interests of labor and management, as well as those of the general public" are served by swift, non-appealable resolution of labor disputes concerning these critical public employees, Act 111's explicit "restraint on judicial activism is the linchpin of" the act).

Although I disagree with the majority's analysis, I welcome our review of this case because it helps to illustrate one of the central points in my concurring and dissenting opinion in *International Ass'n of Firefighters*. Act 111 was devised to ensure "the swift resolution of disputes" in order to "decrease[ ] the chance that the workforce would be destabilized by protracted litigation, a state harmful to all parties." *Town of McCandless v. McCandless Police Officers Association*, 587 Pa. 525, 901 A.2d 991, 997 (2006). In order to achieve this

---

**3.** The majority cites *City of Washington v. Police Department of City of Washington*, 436 Pa. 168, 259 A.2d 437 (1969), as precedent for recognition of a "managerial prerogative" component in Act 111, based on a single sentence. *See* op. at 599–600. That sentence reads: "Public employers are in many respects more constrained in what they may do vis-à-vis their employees, and those limitations must be maintained." *City of Washington, supra* at 442. I believe it is a serious misinterpretation of *City of Washington* to conclude that this sentence is somehow recognition of managerial power. Reading *City of Washington* in its proper context, I believe that the above sentence simply expresses the reality that public employers may be constrained by relevant legislation and may not be forced by arbitration awards to commit illegal acts. Accordingly, we recognized that arbitrators do not have the authority to impose an award that would require, for example, a local municipality to violate a statute of the General Assembly. Indeed, *City of Washington* recognized "that the scope of the submission to the" arbitration panels involved the "legitimate terms and conditions of employment" and that an arbitration award may "mandate" the public employer to take whatever action is necessary, within the employer's power, to implement that award. *Id. See also* 43 P.S. § 217.7.

goal, "the legislature dictated a restraint on judicial activity ... and forbad appeals from an arbitration award." *Id.*[4] *See also Betancourt, supra* at 89 ("[A]n Act 111 arbitration panel's resolution of the dispute must be sure and swift[.; otherwise,] much of its effectiveness would be lost if the mandate of its decision could be delayed indefinitely through protracted litigation. ... **The legislature's intent was to prevent Act 111 arbitration awards from miring down in litigation.**") (emphasis added).[5]

How have the courts of this Commonwealth treated the "no appeal" mandate in Act 111 and how have they otherwise sought to implement the legislature's intent? What weighty issues of state have prompted the courts to set aside Act 111's clear mandate against judicial review in order to safeguard the critical workings of government and the public weal? Consider the following language from the majority's opinion in the instant case, which I quote with respect:

> [W]e note that no one disputes that ... police officers were permitted to smoke and use other tobacco products in Borough buildings, vehicles, and equipment. Additionally,

4. Section 7 of Act 111 provides, in relevant part: "The determination of the majority of the board of arbitration thus established shall be final on the issue or issues in dispute and shall be binding upon the public employer and the policemen or firemen involved. Such determination shall be in writing and a copy thereof shall be forwarded to both parties to the dispute. No appeal therefrom shall be allowed to any court." 43 P.S. § 217.7.

5. I understand both that the present case is on appeal from a decision of the PLRB based on the Union's filing of a charge of unfair labor practices, and that decisions of the PLRB are not subject to the Act 111 "no appeal" mandate. However, there can be no doubt that the majority's interpretation of Act 111 will be applied to the endless stream of future appeals from "non-appealable" Act 111 arbitration awards. Thus, I believe this case is illustrative of the ridiculous extent to which the concept of "managerial prerogatives," imported into the sphere of Act 111, has rendered virtually meaningless an essential component of Act 111, its "no appeal" mandate. Now, on appeal, courts are endlessly determining whether a subject in contention falls on one or the other side of the imaginary, judicially-created line that separates "managerial prerogatives" from "bargainable" terms and conditions of employment. Once again, I submit that this Court is required to interpret Act 111 in a manner that applies, and makes meaningful, its actual provisions.

. . . tobacco usage in the workplace is germane to the work environment. Furthermore, we find that the topic of workplace tobacco usage is unlike those significant core entrepreneurial topics that are more naturally considered to be inherently managerial in nature such as decisions regarding the programs of the employer, standards of service, overall budget, use of technologies, organizational structure, and selection and direction of employees. *See* [Section 702 of PERA,] 43 P.S. § 1101.702. Thus, we conclude that collective bargaining over the policy regarding tobacco usage does not unduly infringe upon employer's inherent managerial decision making. Therefore, in these circumstances, the Borough's ban on tobacco products was not a managerial prerogative, and, thus, was subject to mandatory collective bargaining.

Op. at 376, 998 A.2d at 600–01.

Now, in this case, the Commonwealth Court and this Court have devoted their considerable resources and attention to figure out whether general smokeless tobacco usage and limited smoking by police officers is an issue subject to collective bargaining or whether it resides in the amorphous gelatin of "managerial prerogatives." I believe I rest on solid ground in opining that such judicial review is not exactly what the General Assembly had in mind when it enacted Act 111. Rather, in my opinion, it is beyond peradventure that issues such as the one in the instant case begin with the collective bargaining process and should end with the arbitrator's decision. "No appeal therefrom shall be allowed to any court." 43 P.S. § 217.7. Thus, I believe that the majority's perception of a broad managerial prerogative component in Act 111 cases, and its casual view of the role of appellate courts to determine the reach of managerial prerogative on a case-by-case basis, wholly ignores both the letter and intent of Act 111. Worse still, the majority has now, out of the blue, regrettably added the concept of "entrepreneurial topics" to define the public employer's "managerial prerogatives," [6] thus expanding even farther the reach of "managerial prerogative," a concept non-

6. Op. at 376, 998 A.2d at 600.

existent in the actual language of Act 111. For these reasons and the additional reasons I set forth in my concurring and dissenting opinion in *City of Philadelphia,* I cannot join the majority in this "rewriting" of Act 111.

Additionally, for these same reasons, I cannot join in the majority's determination that courts, on a case-by case basis, must determine whether an ordinance may remove terms and conditions of employment of Act 111 employees from the bargaining table. *See* op. at 376–77, 998 A.2d at 601–02. In my respectful opinion, municipalities may not avoid bargaining over terms and conditions of employment with Act 111 employees by passing ordinances that purportedly preempt consideration of matters that would otherwise be clearly bargainable. "We emphasize that [a public employer may] **not** ... hide behind self-imposed legal restrictions." *City of Washington v. Police Department of City of Washington,* 436 Pa. 168, 259 A.2d 437, 442 (1969) (emphasis in original). Act 111 does not restrict the extent or nature of "terms and conditions" of employment subject to bargaining.