**PENNSYLVANIA STATE TROOPERS ASSOCIATION, Petitioner**

**v.**

**PENNSYLVANIA LABOR RELATIONS BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 13, 2011.

Decided March 5, 2012.

Sean T. Welby, Harrisburg, for petitioner.

Keith Alan Herbster, Senior Counsel, for intervenor Pa. State Police. Carolyn M. Sargent, Assistant Counsel, for respondent.

BEFORE: PELLEGRINI, Judge [1], and SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge LEAVITT.

The Pennsylvania State Troopers Association (Union) petitions for review of an adjudication of the Pennsylvania Labor Relations Board (Board) holding that the Pennsylvania State Police (State Police) did not commit unfair labor practices when

---

1. This case was assigned to the opinion writer before January 7, 2012, when Judge Pellegrini became President Judge.

it issued disciplinary action reports against two of its members, which were later rescinded. Union argues that the Board erred because the record showed that the State Police acted with anti-union *animus* and in a manner that was destructive of employee rights. Concluding that the record does not support these conclusions, we affirm.

On June 19, 2009, Union filed a charge of unfair labor practices with the Board, claiming that the State Police violated Sections 6(1)(a), (c) and (e) of the Pennsylvania Labor Relations Act (Act)[2] as read in *pari materia* with Act 111 of 1968.[3] Specifically, Union charged that the State Police violated the Act by issuing disciplinary action reports against Corporal Gerald Williams and Trooper Joseph Plant. Trooper Plant is the President and Corpo-

ral Williams the Vice–President of Fraternal Order of Police Lodge 43. The disciplinary action reports stated that Williams and Plant had misrepresented that they had received complaints about a captain and that the two had conducted an unauthorized investigation of said captain. Union contended that the disciplinary action reports were issued in retaliation for Plant's and Williams' protected union activities. Union also contended that the disciplinary action reports were motivated by antiunion *animus*. The Board assigned the complaint to a hearing examiner.

The hearing began with Williams' testimony. Williams, a 19–year service member, has served as vice-president of the local union for the past ten years. His union duties required him to "sort out or file grievances" on behalf of Union mem-

---

2. Act of June 1, 1937, P.L. 1168, *as amended,* 43 P.S. § 211.6. It provides in relevant part:

 (1) It shall be an unfair labor practice for an employer—
 (a) To interfere with, restrain or coerce employes in the exercise of the rights guaranteed in this act.

 \*　　\*　　\*

 (c) By discrimination in regard to hire or tenure of employment, or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, [t]hat nothing in this act, or in any agreement approved or prescribed thereunder, or in any other statute of this Commonwealth, shall preclude an employer from making an agreement with a labor organization (not established, maintained or assisted by any action defined in this act as an unfair labor practice) to require, as a condition of employment, membership therein, if such labor organization is the representative of the employes, as provided in section seven (a) of this act, in the appropriate collective bargaining unit covered by such agreement when made and if such labor organization does not deny membership in its organization to a person or persons who are employes of the employer at the time of the making of such

agreement, provided such employe was not employed in violation of any previously existing agreement with said labor organization.

 \*　　\*　　\*

 (e) To refuse to bargain collectively with the representatives of his employes, subject to the provision of section seven (a) of this act.
43 P.S. § 211.6(1)(a), (c) and (e) (footnotes omitted). Section 7(a) of the Act provides: Representatives designated or selected for purposes of collective bargaining by the majority of the employes in a unit appropriate for such purposes, shall be the exclusive representatives of all the employes in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: Provided, [t]hat any individual employe or a group of employes shall have the right at any time to present grievances to their employer.
43 P.S. § 211.7(a).

3. The Act commonly referred to as "Act 111" is the Act of June 24, 1968, P.L. 237, *as amended,* 43 P.S. §§ 217.1–217.10. Act 111 grants police personnel the right to collectively bargain with their employer and the right to arbitrate their disputes.

bers. Reproduced Record at 27a (R.R. ____).

Williams stated that in 2008, "guys" working at the Wyoming barracks approached him and Trooper Plant, complaining that Captain Willard Oliphant, who is in charge of internal affairs for the State Police, was depositing his personal trash at the Wyoming barracks. Oliphant lives near the Wyoming barracks but does not work there. On December 2, 2008, Williams noticed four 32–gallon bags of garbage blocking a police car. The maintenance supervisor, Robert A. Smith, complained to Williams that he was tired of taking care of Oliphant's trash. Williams took a picture of the garbage and showed it to Lieutenant Michael Kreidler, the staff services section commander, explaining that the "guys are tired of seeing Captain Oliphant's trash here . . . [and] the maintenance guy is tired of burning his trash, getting rid of his trash." R.R. 30a. Later that day, Williams was called to Captain Donald Peters' office, where he repeated the complaints about Oliphant's trash. Peters said he would take care of the matter and mentioned something about "casting a net and people getting caught up in it." R.R. 32a. Williams inferred from Peters' remark that his complaint about Oliphant's trash would be used against him in some manner.

Williams acknowledged that when the maintenance men were questioned about Oliphant's trash, they denied having ever complained about it. Williams also acknowledged telling Lieutenant Nicholas Saites, who investigated the trash complaint, that the maintenance men did *not* complain to him. Williams explained that he meant only that the maintenance employees did not file a formal complaint.

Williams testified that during this time frame he, Williams, was the subject of an internal State Police investigation prompted by an e-mail in which Williams referred to the command staff as a "classless, good-ole boy network of commissioned officers." R.R. 280a. This investigation, which was initiated in September 2008 to determine whether Williams' e-mail violated professional standards, was still open when Williams complained about Oliphant.[4] Sergeant Jay Livziey set up an interview of Williams for January 6, 2009, but two days later changed it to December 19, 2008. The change was made after Williams informed Livziey that a trial Williams expected would consume much of his time during the month of December had been postponed.

To set up and change the interview dates, Livziey had communicated with Williams by e-mail. Williams detected a change in the tone of Livziey's two e-mails, which became more formal in Williams' view. Williams attributed this change in tone to Williams' intervening complaint about Oliphant.

Trooper Plant also testified. Plant, a 19–year State Police veteran, had served as the president of the local union for the previous ten years. At the time, he was also a member of Union's board of directors, a member of the grievance board and chairman of the disciplinary committee.

In the spring of 2008, Plant received a complaint about Oliphant's trash. He did not remember who first complained, but he explained that over the course of several months it became a topic of discussion. Upon hearing from Williams about Livziey's frosty e-mails, Plant became con-

---

4. By the time of the hearing the State Police concluded that Williams' e-mail constituted protected speech because it involved protect-ed union activity and closed its non-professional conduct investigation of Williams.

cerned that Oliphant now had a hand in the investigation of Williams for the alleged unprofessional email. Plant communicated his concern to Lieutenant Colonel John Brown, who oversees the Bureau of Integrity and Professional Standards. Brown informed Plant he would look into the matter.

Plant noted that "almost always" the suspect is interviewed last in an investigation. R.R. 91a. In the case of the trash investigation, however, Oliphant was interviewed first, and Plant and Williams were interviewed last. Plant provided Saites with photographs of Oliphant's trash.

Plant testified that the disciplinary action report issued by Captain Dougherty, the new commanding officer of the barracks, made it difficult for him to discuss Union matters with Dougherty. It hampered his ability to serve as an effective Union representative.

Captain Dougherty was called as a witness by Union. Dougherty assumed the position of commanding officer on May 16, 2009, at which time he was presented with the internal investigation report of Oliphant. The report concluded that the complaint against Oliphant was unfounded. It suggested that Williams and Plant had misrepresented the employee complaints about the trash. Concluding that Williams and Plant had acted improperly, on May 21, 2009, Dougherty issued pre-disciplinary conference notices to Williams and Plant. The notice explained that Williams and Plant could request a conference and submit additional evidence. Neither officer availed himself of the conference opportunity. Accordingly, on June 5, 2009, Dougherty issued the disciplinary action reports at issue here.

Thereafter, Dougherty came to believe the Oliphant investigation report was not entirely accurate or complete. He learned that employees had, in fact, complained about the trash, and he concluded that the trash deposited by Oliphant had created a morale problem. He also learned that the maintenance staff were known to complain and then later deny having complained. Dougherty concluded, therefore, that Williams and Plant had not made any misrepresentations to Saites.

Nevertheless, Dougherty concluded that Williams and Plant had violated procedures by placing Oliphant under surveillance and taking photographs with a State Police camera. Based on the totality of circumstances, Dougherty concluded that discipline was not necessary and in March 2010 he rescinded the disciplinary action reports.[5]

Captain Peters testified for the State Police. He was Dougherty's predecessor as troop commander. He acknowledged making the "fish in a net" comment to Williams when Williams complained about Oliphant's trash. Peters explained that he meant only that a challenge to customary practices can lead to other challenges to other customary practices. Peters also testified that Oliphant explained to Peters that he brought cardboard to be burned in the incinerator. He did so because he had

---

5. Union presented several other witnesses. Sergeant Bruce Edwards agreed that he discussed the trash issue with Lieutenant Colonel Brown. Lieutenant Kriedler testified that he asked the maintenance staff about the situation and the maintenance supervisor replied that "they didn't complain to anybody" about the trash. R.R. 181a. Troopers Jeffrey Lamm, Christopher O'Brien and Jerome Yeni-

nas testified that they were upset that Captain Oliphant was bringing garbage to the garage, as this was something they would not be permitted to do. They also questioned how Williams and Plant could be disciplined for making a complaint; it led them to believe that it would be dangerous to make a complaint about a superior officer.

received permission to do so several years earlier. Oliphant offered to stop if it caused a problem, and Peters told him to stop. Peters informed Williams of these facts and thought the matter was resolved until he learned that Lieutenant Colonel Brown thought an investigation should be opened on Oliphant.

Lieutenant Saites, who works for internal affairs and investigated the complaint against Oliphant, next testified for the State Police. He explained that Williams informed him that the maintenance men did not initiate the complaint; rather, Williams raised the issue with the maintenance men. Williams declined to identify any of the individual employees who had complained about Oliphant's trash. Further, Saites interviewed a number of employees at the barracks and not one admitted to complaining. Plant informed Saites that he had watched Oliphant place the bags in the garage from a hiding spot. He then took photos with a State Police camera. Plant gave him a disc of digital photos that showed the contents of the bags removed, spread out on a desk and individually photographed.

Saites issued a report to Dougherty, stating that he found the charges against Oliphant to be unfounded. The report stated that Williams had exaggerated the complaints and that Plant had conducted his own, unauthorized investigation. Saites assumed his report would end the matter.

The hearing officer found Union's unfair labor practice complaint to lack merit under the applicable provisions of the Act. Although Union charged the State Police with a violation of Section 6(1)(e) of the Act, the hearing officer found that charge to be waived because Union did not pursue it at the hearing. The hearing examiner also found that the Section 6(1)(a) charge was presented as a derivative violation, not an independent one. Thus, Union's evidence that members were discouraged from engaging in protected activities was irrelevant because that would establish an independent violation, not a derivative violation.

As to the discrimination claim brought as a derivative violation of Section 6(1)(a) of the Act and a direct violation of Section 6(1)(c) of the Act, the hearing examiner found that Union did not make a *prima facie* case. He agreed that Williams and Plant engaged in a protected activity by voicing complaints about Oliphant's trash. However, the hearing examiner concluded that Dougherty's disciplinary action reports were not motivated by anti-union *animus*. To the contrary, he found that Dougherty testified credibly that the disciplinary action reports were based on facts learned in the Oliphant investigation. Although Union argued that the Oliphant investigation was a sham and done to punish Williams and Plant for complaining about a superior, the hearing examiner found there was no evidence of such a conspiracy.

 Union filed exceptions to the proposed decision and order of the hearing examiner. The Board dismissed the exceptions and issued a final determination based on the proposed decision and order. Union now appeals to this Court.[6]

6. In reviewing a decision of the Board, our review is limited to determining whether there has been an error of law, a violation of constitutional rights or whether the findings are supported by substantial evidence. *Borough of Ellwood City v. Pennsylvania Labor Relations Board*, 606 Pa. 356, 365, 998 A.2d 589, 594 (Pa.2010). "[A] decision of the Board must be upheld if the Board's factual findings are support by substantial evidence, and if conclusions of law drawn from those facts are reasonable, not capricious, arbitrary,

Union has raised three issues for our review: (1) whether the Board erred in failing to find a violation of Section 6(1)(c) of the Act where the State Police actions had been inherently destructive of important employee rights; (2) whether the Board erred in holding that Union did not make a *prima facie* case of anti-union *animus;* and (3) whether the Board erred in dismissing the alleged independent violation of Section 6(1)(a) of the Act.

■ A union bears the burden of proving that it was engaged in a protected activity and that the employer's adverse action was motivated by anti-union *animus. Pennsylvania Labor Relations Board v. Stairways, Inc.,* 56 Pa.Cmwlth. 462, 425 A.2d 1172, 1174–75 (1981). However, under *National Labor Relations Board v. Great Dane Trailers, Inc.,* 388 U.S. 26, 34, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), a union does not have to prove anti-union motivation where "it can reasonably be concluded that the employer's discriminatory conduct was 'inherently destructive' of important employee rights. . . ."

■ Here, Union first argues that, consistent with the principles of *Great Dane Trailers,* it proved that the State Police actions were inherently destructive of important employee rights. It argues that the mere issuance of a disciplinary action report to Union officials for relaying employee complaints to management is inherently destructive of important employee rights. Accordingly, this was enough to prove anti-union *animus.* The Board counters that this issue was not raised by Union in its petition for review.

The Board is correct. The petition for review states that the Board erred in holding that Union did not make a *prima facie* case of anti-union *animus.* That is the

or illegal." *Id.* Further, "an administrative agency's interpretation of a governing statute

Union's second allegation of error, discussed below. Issues not raised or "fairly comprised" within the petition for review are deemed waived. Pa. R.A.P. 1513(d); *Jimoh v. Unemployment Compensation Board of Review,* 902 A.2d 608, 611 (Pa. Cmwlth.2006). The issue of whether the State Police acted in a way that was inherently destructive of employee rights is not fairly comprised within the issue of anti-union *animus.*

■ In its second issue, Union argues that it presented sufficient evidence of anti-union *animus,* and the Board erred in otherwise holding. The Board counters that at best Union proved a suspicion, which is not substantial evidence of anti-union *animus.*

Union argues that the investigation opened by Lieutenant Colonel Brown demonstrates anti-union bias. However, the evidence showed that Brown did the investigation at Plant's request, after Plant had expressed concern that the investigation of Williams was being impacted by Williams' complaint about Oliphant. Brown told Plant he would "look into the matter and see if there was any validity to it." The president of the local union also raised this issue with Brown. Thus, Union's own evidence showed that Lieutenant Colonel Brown acted at the prompting of Plant and Union, which does not support an inference of an anti-union conspiracy.

Union points to other evidence. It argues that the investigation of Oliphant was not thorough; that the investigator, Saites, reported to Oliphant; that Sergeant Livziey abruptly rescheduled his investigation of Williams after the Oliphant complaint was made; and that Williams and Plant were interviewed last, instead of first, in the Oliphant investigation.

is to be given controlling weight unless clearly erroneous." *Id.*

The union bears the burden of proving a *prima facie* case of antiunion *animus*. *Shive v. Bellefonte Area Board of School Directors*, 12 Pa.Cmwlth. 543, 317 A.2d 311, 313 (1974). Evidence proving "suspicion and conjecture" does not constitute substantial evidence of anti-union bias. *Id.*, at 314. The order in which Saites decided to talk to witnesses is a matter of discretion. That Union may have conducted the Oliphant investigation differently does not constitute substantial proof of anti-union bias. Further, the State Police evidence explained why Livziey rescheduled Williams' interview, *i.e.*, because Williams' schedule opened up after Williams was released from having to participate in a trial. Williams' concern about the "tone" of Livziey's e-mails is too subjective to have evidentiary value.

■ Union also claims it made a *prima facie* case of disparate treatment. "Disparate treatment has previously been recognized in discrimination cases as a valid way of demonstrating an improper bias provided the circumstances of the employees who are compared with the complainant are sufficiently similar." *City of Reading v. Pennsylvania Labor Relations Board*, 130 Pa.Cmwlth. 397, 568 A.2d 715, 719 (1989). Union claims that Oliphant's disposal of his personal trash at the barracks constituted theft of services, for which he was not disciplined. By contrast, Williams and Plant were disciplined for an instance of "theft of services," *i.e.*, conducting an unauthorized investigation while on duty. This is not a persuasive argument.

No one was charged with theft of services. Williams and Plant were disciplined for making misrepresentations and for conducting an unauthorized investigation.

The investigation report on Oliphant stated that he left approximately four garbage bags of cardboard and paper, per month, at the incinerator door and that Oliphant had received permission from his superior to do this years ago. Oliphant did not act in an unauthorized manner. By contrast, Williams and Plant, as Dougherty testified, violated procedures by *sua sponte* initiating their investigation of Oliphant. Dougherty was Union's own witness. The conduct of Oliphant and the conduct of Williams and Plant were not similar; accordingly, there is no foundation for a disparate treatment claim.

■ In its third issue, Union argues that the Board erred in holding that Union did not plead an independent violation of Section 6(1)(a) of the Act. Because the hearing examiner found that Union had only charged a derivative violation of Section 6(1)(a), it did not address the independent violation issue.

Under Section 6(1)(a) of the Act, an unfair labor practice may be independent, or it may be derivative when combined with another violation of any of the provisions in Section 6(1)(b) through (f) of the Act. An independent violation occurs when an employer engages in conduct that under the totality of the circumstances would "interfere with, restrain or coerce employes in the exercise of the rights guaranteed in this [A]ct." 43 P.S. § 211.6(1)(a).[7]

Union alleged that the discipline of Williams and Plant was motivated by anti-union *animus* in response to their engaging in a protected activity, *i.e.*, complaining about Oliphant. However, Union did not allege facts to show that management "interfered with, restrained or coerced"

---

7. The rights of employees provided for under the Act are "the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection." Section 5 of the Act, 43 P.S. § 211.5.

Williams and Plant in the exercise of their protected rights. For this reason, the Board concluded that an independent violation of Section 6(1)(a) was not alleged.

Union argues that it cited Section 6(1)(a) of the Act on the Board's own complaint form. The Board counters that it is the facts alleged in the complaint that are dispositive, not the legal citations. Regardless of the sufficiency of its pleading, the Board argues that Union's evidence did not prove the State Police interfered with, restrained or coerced Williams and Plant. We agree.

The Board's regulations require a clear statement of facts in an unfair labor practice complaint. The regulation states that a charge shall include, *inter alia*, the following information:

> A clear and concise *statement of the facts constituting the alleged unfair practice*, including the name of the individuals involved in the alleged unfair practice, the time, place of occurrence and nature of each particular act alleged, and reference to the specific provisions of the act alleged to have been violated.

34 Pa.Code § 95.31(b)(3) (emphasis added). The regulation also requires that "charges shall set forth fully and specifically all the information and facts required by the act," and it warns that a failure to comply may result in a dismissal "without further proceedings." 34 Pa.Code § 95.37.

Union's complaint alleges that the "disciplinary action was pretext for retaliation against Plant and Williams for their protected activities, including. [sic] It was motivated by anti-union animus." R.R. 6a. This states a conclusion, not a fact. The complaint does not state any facts to show how or why the disciplinary action was pretextual or how the State Police interfered with, restrained or coerced its employees. In short, Union's complaint did not state an independent violation of Section 6(1)(a) of the Act.

However, even if we were to conclude that alleging retaliation is sufficient to encompass a charge of interference with protected rights, it would not change the outcome. The Board argues that the issuance of disciplinary action reports for a legitimate, non-discriminatory reason cannot possibly be viewed as interfering with, restraining or coercing an employee in the exercise of his protected rights. We agree.

Based on Union's own evidence, the Board found that Plant and Williams were disciplined for reasons wholly unrelated to their union activities. The Board is the finder of fact. *Borough of Ellwood City v. Pennsylvania Labor Relations Board,* 606 Pa. 356, 365, 998 A.2d 589, 594 (2010). Although Union presented evidence that several other employees *felt* intimidated by the disciplinary action reports issued to Williams and Plant, Union did not provide any evidence that the disciplinary action reports were done for any reasons other than those stated by Dougherty, Union's own witness. There is simply no evidence that Dougherty intended to intimidate other employees, who were not disciplined, from engaging in protected activities.

For the above-stated reasons, we affirm the Board's adjudication that the State Police did not commit an unfair labor practice when it issued disciplinary action reports to Williams and Plant, which were rescinded nine months later. Ironically, had Williams and Plant simply availed themselves of the opportunity to meet with Captain Dougherty before he issued his reports, this whole matter might have been avoided.

## *ORDER*

AND NOW, this 5th day of March, 2012, the order of the Pennsylvania Labor Rela-

tions Board, dated May 17, 2011, in the above-captioned matter is hereby · AFFIRMED.