**LANCASTER COUNTY, Petitioner**

v.

**PENNSYLVANIA LABOR RELATIONS BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 13, 2011.
Decided Jan. 12, 2012.

---

1. Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*.

Susan R. Friedman, Lancaster, for petitioner.

Warren R. Mowery, Jr., Harrisburg, for respondent.

Amy L. Rosenberger, Philadelphia, for intervenor AFSCME District Council 89.

BEFORE: PELLEGRINI, Judge, and SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge PELLEGRINI.[1]

Lancaster County (County) appeals from an order of the Pennsylvania Labor Relations Board (Board) affirming a decision of the Hearing Examiner that the County committed an unfair labor practice in violation of Section 805 of the Public Employe Relations Act (PERA)[2] by refus-

---

1. This case was assigned to the opinion writer prior to January 7, 2012, when Judge Pellegrini became President Judge.

2. Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. § 1101.805. Section 805 states:

   Notwithstanding any other provisions of this act where representatives of units of guards at prisons or mental hospitals or units of employes directly involved with and necessary to the functioning of the courts of this Commonwealth have reached an impasse in collective bargaining and mediation as required in section 801 of this article has not resolved the dispute, the impasse shall be submitted to a panel of arbitrators whose decision shall be final and binding upon both parties with the proviso that the decisions of the arbitrators which would require legislative enactment to be effective shall be considered advisory only.

ing to implement an interest arbitration award (Award) because the County did not meet its burden of demonstrating that implementation of the Award would require legislative enactment. Discerning no error in the Board's decision, we affirm.

The American Federation of State, County and Municipal Employees, District Council 89 (AFSCME) and the Lancaster County Commissioners (Commissioners) were parties to a collective bargaining agreement which set forth the conditions of employment for corrections officers at the Lancaster County prison. That agreement expired on December 31, 2008, and the parties were unable to reach a new agreement. An impasse was declared, and the parties referred the dispute to an arbitration panel pursuant to Section 805 of the PERA. Subsequently, the arbitration panel issued an Award directing the County to pay shift differential, wage and longevity pay increases to the bargaining unit employees each year for the three-year period running from January 1, 2009, through December 31, 2011.

The County did not appeal the Award and implemented the provisions for 2009. However, after meeting several times and consulting the County's legal counsel, the Commissioners passed a resolution stating in their determination that the financial terms of the Award for 2010 and 2011 would require the appropriation of funds or levying of taxes and, therefore, they rejected the financial provisions of the Award. Section 805 of the PERA states that, "decisions of the arbitrators which would require legislative enactment to be effective shall be considered advisory only." 43 P.S. § 1101.805. According to the Commissioners, implementing the financial provisions of the Award would cost up to $650,000 and there was no extra money in the 2010 prison budget or the general fund budget to cover these additional costs.[3] Given the County's deteriorating financial situation and the alleged lack of funds, the Commissioners determined that implementing the financial terms of the Award would require the appropriation of funds or a tax increase; therefore, the Commissioners believed the financial terms were advisory only. When the County failed to implement the wage increases in January 2010, AFSCME filed a charge of unfair labor practices with the Board under Sections 1201(a)(1) and 1201(a)(5) of the PERA.[4]

Michael Messina (Mr. Messina), a labor economist in AFSCME's department of research and collective bargaining services, testified before the Hearing Examiner. Mr. Messina provides technical assistance during collective bargaining, such as negotiating contracts, evaluating the financial

---

3. The County points out in its Brief to the Court that the total purported cost of implementing the wage increases of the Award for 2010 and 2011 was almost $2 million. The County treated the proposed wage increases for 2011 as advisory and AFSCME challenged this refusal as well. However, the Hearing Examiner determined that AFSCME's challenge regarding the 2011 provisions was prematurely filed because the County had not yet failed to implement these increases. Because neither party filed exceptions to this portion of the proposed decision and order, the only issue on appeal to this Court is that regarding the 2010 provisions of the Award.

4. Section 1201(a) of the PERA states, in pertinent part:

(a) Public employers, their agents or representatives are prohibited from:

(1) Interfering, restraining or coercing employes in the exercise of the rights guaranteed in Article IV of this act.

. . .

(5) Refusing to bargain collectively in good faith with an employe representative which is the exclusive representative of employes in an appropriate unit, including but not limited to the discussing of grievances with the exclusive representative.

health of employers, and overseeing the development of compensation and benefit surveys. With respect to this case, Mr. Messina was asked to calculate the cost of the financial provisions of the Award which the Commissioners failed to implement. Mr. Messina testified that if the County had implemented the financial provisions of the Award for 2010, it would have cost an additional $484,833. This total included $387,000 for the wage increase, $15,496 for the shift differential increase and $48,000 in overtime. Mr. Messina was also asked to determine whether there was sufficient financial flexibility within the County's budget so that a tax increase would not be required in order to fund the Award. To this end, Mr. Messina reviewed the County's Comprehensive Annual Financial Reports and County budget documents for the past 10 years. According to Mr. Messina, these documents demonstrated that the County had a tendency to overestimate its total expenditures for its prison operation and typically spent less than anticipated. Mr. Messina also testified to an approximate $3 million excess in the County's general fund at the end of 2010.

Scott F. Martin (Commissioner Martin), a Lancaster County Commissioner since 2008, testified that the Commissioners typically presented a proposed budget to the public every year on the day before Thanksgiving. The Commissioners then voted on the budget during a public meeting held around the third week of December. Tax rates were usually set at this same meeting as well. Commissioner Martin testified that the County budget for 2010 had not yet been approved when the Commissioners voted to treat the financial provisions of the Award as advisory. Prior to passing the 2010 budget, the Commissioners met in executive session 3 or 4 times and met with counsel to specifically discuss the Award provisions for 2010.

Commissioner Martin testified that in making the decision that the financial terms of the Award were advisory, the Commissioners considered the national economic downturn; the dire financial status of the Commonwealth; that housing new starts were down throughout the County; the County was going through a difficult budget impasse; utility costs were rising; and the County had experienced a sharp increase in unemployment. Commissioner Martin stressed that for the first time in the County's history, it was forced to cut jobs, eliminating 19 positions in December 2009, and 7 more in July 2010. In addition, the County had to consolidate various departments, entities were taking a 10 to 15% pay cut, and the Commissioners were considering whether to totally eliminate the Lancaster County Human Relations Commission due to lack of funding. Commissioner Martin testified that they decided not to give any pay increases in 2010 to any County employees, and that the Commissioners tried to treat the County's union and non-union employees the same as far as wage increases. According to Commissioner Martin, implementing the Award for 2010 would have cost up to $650,000 and would have required a tax increase in order to cover this cost. When asked why he believed he did not have to implement the Award, Commissioner Martin stated:

> [The Board of Commissioners] didn't believe we had the funding in order to do that. And we knew, given the fact— that basically would have had us raising taxes, increasing the millage rate in order to generate those additional revenues. And that's a legislative action, and that's not something that the elected board was willing to do.

(Reproduced Record (R.R.) at 126a). However, Commissioner Martin also admitted that there was approximately $3

million left in unreserved funds in the County's general fund for the 2010 fiscal year.

Andrew Sapovchak (Mr. Sapovchak), an auditing/accounting supervisor for the County Controller's Office, testified that the County typically did not have transfers between departments throughout the year, and the prison used almost 100% of its budget every year. According to Mr. Sapovchak, the County tried to have enough money in the general fund balance going into a new calendar year to cover the first two months expenses until taxes were received. Mr. Sapovchak testified that less than 5% of the County's general fund budget for 2009 was unreserved, which was significantly lower than the 12 to 15% recommended by bond rating agencies.

Margaret Weidinger (Director Weidinger), the Director of IT and Budget Services for the County, also testified that 2010 was a tough budget cycle for a lot of County departments, and it was the first time that employees actually lost their jobs for financial and economic reasons. According to Director Weidinger, the County's ending balance had been decreasing over the past few years, and it was projected to end the 2010 year with a $9 million cash balance. Director Weidinger admitted that transfers within a department, from one item to another, were rather common.

The Hearing Examiner issued a proposed decision and order finding there were unmarked general funds in the County's 2010 budget sufficient to fund the Award for 2010. Therefore, the County failed to meet its burden of establishing that a legislative enactment was necessary to fund the Award and committed an unfair labor practice by unlawfully refusing to implement the financial provisions of the binding interest arbitration Award for 2010. The County filed exceptions, which were dismissed by the full Board by final order dated April 26, 2011. This appeal followed.[5]

On appeal, the County argues the Board erred in holding that the County failed to demonstrate that implementing the financial terms of the Award would require legislative enactment. The County provided uncontroverted evidence that implementing the financial provisions of the Award would cost up to approximately $650,000 in 2010. According to the County, there was no money available when the 2010 budget was adopted in order to implement these financial provisions and cover this cost. The County points to the testimony that 19 County employees were laid off in the previous year due to lack of funding, several County departments were closed, important services were cut, and for the first time ever, no County employee received a pay increase. In addition, the County relies upon the assertion that the level of unreserved cash in the Coun-

5. When reviewing a decision of the PLRB, our scope of review is limited to determining whether an error of law was committed, whether there was a violation of constitutional rights, or whether the PLRB's necessary findings are supported by substantial evidence. *Lycoming County v. Pennsylvania Labor Relations Board*, 943 A.2d 333, 341 n. 20 (Pa.Cmwlth.2007). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* As our Supreme Court has stated, "an administrative agency's interpretation of a governing statute is to be given controlling weight unless clearly erroneous," and a reviewing court "will not lightly substitute its judgment for that of a body selected for its expertise whose experience and expertise make it better qualified than a court of law to weigh facts within its field." *Borough of Ellwood City v. Pennsylvania Labor Relations Board*, 606 Pa. 356, 365, 998 A.2d 589, 594 (2010) (internal citations omitted).

ty's general fund at the end of 2010 was at least $16 million short of the minimum amount recommended by bond rating agencies in order for the County to maintain its bond rating and meet its financial obligations. According to the County, these facts amounted to substantial evidence that a legislative enactment, in the form of a tax increase, would be required in order to implement the Award for 2010 and, therefore, the financial provisions of the Award were advisory only. Given the extensive legal precedent in this area, we disagree. Nonetheless some background is necessary.

Prior to 1962, it was thought that all legislation requiring labor arbitration, grievance, interest or, for that matter, commercial arbitration was unconstitutional under Article 3, Section 20 of the Pennsylvania Constitution, which prohibits delegation of governmental functions and ensures that public affairs rest in the hands of elected officials, not some unelected person or agency. In *Erie Firefighters Local No. 293 of the International Association of Firefighters v. Gardner*, 406 Pa. 395, 178 A.2d 691 (1962), our Supreme Court interpreted this provision and held that arbitration involving only administrative matters did not violate the non-delegation provision. However, our Supreme Court held that an interest arbitration award requiring implementation through legislative action by City Council, in that case a salary and appropriation ordinance, was an unlawful delegation of governmental authority.

As a result, a 1968 Constitutional amendment was presented to the voters to amend that provision to allow interest arbitration for firemen and policemen only, by adding the italicized portion to that Section below:

The General Assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatsoever. *Notwithstanding the foregoing limitation or any other provision of the Constitution, the General Assembly may enact laws which provide that the findings of panels or commissions, selected and acting in accordance with law for the adjustment or settlement of grievances or disputes or for collective bargaining between* **policemen and firemen** *and their public employers shall be binding upon all parties and shall constitute a mandate to the head of the political subdivision which is the employer, or to the appropriate officer of the Commonwealth if the Commonwealth is the employer, with respect to matters which can be remedied by administrative action, and to the lawmaking body of such political subdivision or of the Commonwealth, with respect to matters which require legislative action, to take the action necessary to carry out such findings.*

Pa. Const. Art. III, § 31. As a result, the General Assembly enacted Act 111[6] in 1968,

Because the constitutional amendment was limited to only police and firemen, Section 805 of the PERA states that the decision of an arbitration panel "shall be final and binding upon both parties with the proviso that the decisions of the arbitrators *which would require legislative enactment* to be effective shall be considered advisory only." 43 P.S. § 1101.805. (Emphasis added). The question then became what was a legislative action.

---

6. Act of June 24, 1968, P.L. 237, *as amended,* 43 P.S. §§ 217.1–217.1.

The issue of whether the setting of salaries by the Salary Board[7] constitutes a legislative action was first addressed in *Franklin County Prison Board v. Pennsylvania Labor Relations Board,* 491 Pa. 50, 417 A.2d 1138 (1980). Our Supreme Court held that it was not a "legislative enactment" so as to render the arbitration award advisory because the Salary Board, even though it fixed salaries and compensation, was not a legislative body. The Court went on to state:

> However, the Prison Board can only implement the award to the extent permitted by Art. III, sec. 31 of the Constitution. Thus, the Prison Board can only submit to the Salary Board the financial items of the arbitration award, and the Salary Board must fix the salary and compensation in accordance with the award. If, at that point, legislative enactment is required that is, if taxes must be levied or funds appropriated then our holding herein cannot be read to override the Constitutional prohibition against improper delegation of legislative powers. Where it is demonstrated by the public employer that the lawmaking body has met, considered and rejected an arbitration award concerning financial items, then Art. III, sec. 31 and the proviso of section 805 become operative, and the award is thereby rendered advisory only. In such an event, the only recourse at present available to the public employes is either a constitutional amendment or resort to the political processes.

*Id.* at 62, 417 A.2d at 1144. Under *Franklin County,* if funds had to be appropriated, i.e., authorized for a specific purpose by the County Commissioners, then it was a legislative enactment, and it was in the County's discretion whether to implement the monetary portions of the arbitration award.

In *County of Lehigh v. American Federation of State, County, and Municipal Employees, District Council 88, Local 543, AFL–CIO,* 95 Pa.Cmwlth. 486, 505 A.2d 1104 (1986), we again addressed whether the transfer of funds between accounts was a legislative enactment, but in a county operating under a home rule charter. In that case, Lehigh County conceded that there were sufficient funds in other accounts within the Corrections Department's budget to implement the arbitration award. *Id.* at 1109. Section 706 of the Lehigh County Home Rule Charter, 339 Pa.Code § 1.7–706, provides that "[a]t any time during the fiscal year, the County Executive or the President Judge of the Court of Common Pleas may transfer part or all of any unencumbered balance appropriated for programs, services, or functions within an agency." Therefore, we held "that the transfer of funds, within an agency, from one line item to another, where there are sufficient funds in the budget to make the transfer, [such a transfer] does not require a legislative enactment." *Lehigh County,* 505 A.2d at 1109.

Whether the transfer of funds constituted a legislative act was again addressed by our Supreme Court in *County of Allegheny v. Allegheny Court Association of Professional Employees (ACAPE),* 517 Pa. 505, 539 A.2d 348 (1988). In that case, the County failed to demonstrate that there were not excess or surplus funds available for administrative transfer, either within the County's general fund or specific agen-

---

**7.** Section 1622 of The County Code, 16 P.S. § 1622, creates in each county a salary board composed of the three county commissioners and either the county controller or the county treasurer. Section 1620 of the County Code, 16 P.S. § 1620, provides, in part, that "(t)he salaries and compensation of all appointed officers and employes who are paid from the county treasury shall be fixed by the salary board created by this act for such purposes."

cy funds. It was also established that hundreds of fund transfers were recommended by the County's budget office every year and these transfers were then routinely legislatively approved by the County Commissioners. Even though the action that authorized the transfers was legislative in nature, our Supreme Court held that to equate the transferring of funds from one county account to another with a "legislative enactment" as referred to in Section 805 would "emasculate [PERA] and render all arbitration awards dealing with fiscal matters advisory." *Id.* at 517, 539 A.2d at 355. Our Supreme Court then went on to adopt the reasoning and holding of the trial court judge in *ACAPE*, stating:

> We assume that any arbitration award which grants increased wages to public employees will require such a line item transfer within the political subdivision's budget. Thus, to find that such a transfer constitutes a legislative enactment produces the exact absurd result which the courts of this Commonwealth have struggled to avoid—that of emasculating the value of arbitration as a tool to solve conflicts in labor relations, and overriding the legislature's clear intent that arbitration awards be final and binding on the parties. Rather, we believe that the intended result of the legislature in enacting [PERA] will be honored and effectuated by considering the budget adoption process as legislative enactment, and the subsequent transfer of funds from one line item to another to constitute the ordinary administration of municipal affairs.
>
> Of course, where the implementation of an arbitration award would require the local governmental body to levy further taxes in order to have funds to appropriate to such line item, then the legislature cannot constitutionally be forced to take such action. This would

clearly be legislative enactment, and would conflict with *Franklin County's* expressed concern over taxation without representation. However, where there is money available in the government's general fund or from other items with surplus funds, we hold that in order to effectuate the policy and intent of [PERA], such money must administratively be transferred to fund a legally binding arbitration award.

*Id.* at 515–16, 539 A.2d at 353–54.

■ Admittedly, the facts are different in this case in that the County Commissioners here did not routinely transfer funds between accounts as they did in *Allegheny County.* However, given the expansive language quoted above, we agree with the Board that *ACAPE* controls, and transfers of available unencumbered funds are not legislative acts within the meaning of Section 805 of the PERA even though the County Commissioners must vote on such transfers. Although implementing the financial provisions of the Award for 2010 would undoubtedly cost the County a significant sum, up to approximately $650,000, Commissioner Martin admitted in his testimony that at the end of the year there was approximately $3 million in unreserved funds left in the County's general fund. In fact, in its brief to this Court, the County states, "[f]or the 2010 budget, the total unreserved amount budgeted to remain in the general fund at the end of the budget year was $3,089,201." (County's Brief at 13).

The County cogently argues that the use of general fund reserves are needed to maintain a good bond rating and to have sufficient reserves, and that the implementation of the Award makes for naught all the cutting of salaries, laying off of employees and cutting of programs and services. However, under *ACAPE* that is not

sufficient to overcome the fact that there were sufficient funds available to implement the Award. Even though the County's argument—that what is a legislative enactment is any action that the County Commissioners make in their legislative capacity, including the transfer of funds— has much merit, especially in view of the constitutional prohibition against non-delegation to non-elected officials, we are constrained by our Supreme Court's decision in *ACAPE* and are forced to affirm the Board's decision that the transfer of funds here did not constitute a legislative enactment. Consequently, the Board was correct in determining that the County committed an unfair labor practice by failing to implement the binding Award.

Accordingly, the order of the Board is affirmed.

## ORDER

AND NOW, this *12th* day of *January,* 2012, the order of the Pennsylvania Labor Relations Board, dated April 26, 2011, is affirmed.