**[J-74-2019]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| ASSOCIATION OF PENNSYLVANIA STATE COLLEGE AND UNIVERSITY FACULTIES | : : : : | No. 67 MAP 2018 Appeal from the Order of the Commonwealth Court dated April 19, 2018 at No. 966 C.D. 2017 affirming in |
| v. | : : : | part and reversing in part the June 20, 2017 Final Order of the Pennsylvania Labor Relations Board at No. PERA- |
| PENNSYLVANIA LABOR RELATIONS BOARD | : : : | C-15-240-E. ARGUED: September 12, 2019 |
| APPEAL OF: PENNSYLVANIA STATE SYSTEM OF HIGHER EDUCATION | : : : : | |


**OPINION**


**JUSTICE TODD**                                                  **DECIDED: March 26, 2020**

The Pennsylvania State System of Higher Education ("State System") is comprised of 14 universities, with a combined enrollment of nearly 100,000 degree-seeking students. In this appeal by allowance, we consider whether the State System's policy regarding the protection of minors — requiring, *inter alia*, that faculty members submit to criminal background checks and report to their university employers if they are arrested or convicted of a serious crime, or found or indicated to be a perpetrator of child abuse — constitutes an inherent managerial policy or prerogative, rendering it nonbargainable for purposes of collective bargaining between the faculty and the State System. For the reasons that follow, we find that the policy regarding the protection of minors constitutes

a nonbargainable inherent managerial policy. Thus, we reverse the order of the Commonwealth Court.

By way of background, the Association of Pennsylvania State College and University Faculties (the "Association") was initially formed in 1937 as a professional association for faculty at Pennsylvania's teacher colleges. The Association is an "employe organization" within the meaning of the Public Employe Relations Act ("PERA"), which, since its enactment in 1970, permits collective bargaining for certain public sector employees.[1] The Association represents a bargaining unit of over 6,000 faculty members and athletic personnel employed at the universities that comprise the State System. The Association and the State System were parties to a collective bargaining agreement ("CBA"), effective from July 1, 2011 through June 30, 2015, which covered all of the faculty at all of the 14 state universities.[2]

Relevant to this appeal, on July 8, 2014, the State System adopted Policy 2014-01: Protection of Minors (the "Policy"), which required each university in the State System to establish criminal background screening policies and procedures for their employees. The State System's Board of Governors, which is charged with planning and coordinating the development and operation of the State System, had been prompted by incidents of sexual abuse of children at Penn State University to re-examine the State System's policies. The stated purpose of the Policy is to promote the safety and security of children

---

[1] 43 P.S. §§ 1101.101 to 1101.2301.

[2] The parties ratified a successor CBA in December 2016, which was retroactive to July 1, 2015, and was effective through June 30, 2018. Neither the prior CBA, nor the successor agreement, addressed the background checks or reporting requirements related to this appeal.

who participate in programs at the State System's universities. The State System found that minors are often present on its properties for a variety of activities, including, *inter alia*, class registration and attendance, musical instruction, art and theatre programs, the Pennsylvania Writing Project, swim programs for disabled children, and sports, digital media, and business camps.

After the State System promulgated the Policy, but prior to its implementation, the Pennsylvania legislature passed Act 153 of 2014 ("Act 153"),[3] which amended the Child Protective Services Law (the "CPSL"),[4] to expand clearance requirements for school employees and volunteers, and to require them to notify their employer within 72 hours of certain arrests or convictions, as well as of any founded or indicated reports of child abuse. The State System subsequently amended the Policy to include the new reporting and clearance requirements imposed by Act 153, and adopted the amended Policy on January 22, 2015.

In sum, the Policy requires all State System employees to submit to criminal background clearances and to report to their employing universities whenever they are arrested for, or convicted of, certain serious criminal offenses, or found or indicated to be a perpetrator of child abuse. The three types of background clearances required by the Policy are a criminal records check from the Pennsylvania State Police; a criminal records check from the FBI; and a report from the Pennsylvania Department of Human Services concerning whether the individual has been named as the perpetrator of child abuse in an indicated or a founded report. Under the Policy, clearances remain valid for 60 months

---

[3] Act of Oct. 22, 2014, P.L. 529, No. 153.

[4] 23 Pa.C.S. §§ 6301-6378.

and clearance information is kept confidential and maintained separately from the employee's personnel file.

On July 1, 2015, the General Assembly passed Act 15 of 2015 ("Act 15"),[5] which again amended the CPSL, this time *excluding* from the background check and reporting requirements university employees whose direct contact with minors is limited to only students enrolled in the institution or prospective students visiting the campus. After the Act 15 amendment, the relevant provision of the CPSL containing limitations on the aforementioned requirements stated:

> (a.1) School employees.--This section shall apply to school employees as follows:
>
> ***
>
> (2)(i) School employees not governed by the provisions of the Public School Code of 1949 shall be governed by this section.
>
> (ii) This paragraph shall not apply to an employee of an institution of higher education whose direct contact with children, in the course of employment, is limited to either:
>
>> (A) prospective students visiting a campus operated by the institution of higher education; or
>>
>> (B) matriculated students who are enrolled with the institution.

23 Pa.C.S. § 6344(a.1).

Thus, Act 15 rendered the CPSL's reporting and background check requirements inapplicable to many State System employees. The State System, however, did not similarly amend its Policy as a result of these changes to the CPSL. Thus, certain

---

[5] Act of July 1, 2015, P.L. 94, No. 15.

employees and volunteers, no longer legislatively required to comply with the reporting and criminal background check requirements set forth in Act 15, continued to be mandated by the Policy to adhere to existing reporting requirements.

Throughout the process ultimately culminating in the adoption of the Policy, the Association sought to bargain over its substance and impact. Most recently, after Act 15 took effect, the Association sought to collectively bargain over the applicability of the Policy with respect to those employees no longer subject to the CPSL's reporting and background check requirements, asserting that the Policy's requirements in that regard directly implicated the now-statutorily-excluded employees' terms and conditions of employment. The State System ultimately declined the Association's request to bargain, consistently maintaining that the Policy, even with respect to the now-statutorily-excluded employees, was a matter of inherent managerial prerogative, and, thus, not subject to mandatory bargaining under PERA.

Thereafter, on August 18, 2015, the Association filed an unfair labor practice ("ULP") charge, alleging that the State System's refusal to bargain over the Policy violated Sections 1201(a)(1) and (5) of PERA.[6] Following a hearing that spanned several days, the hearing examiner issued a proposed decision and order in which he dismissed the Association's ULP charge as untimely. The Association filed exceptions, which the Pennsylvania Labor Relations Board (the "Board") sustained in part and dismissed in part, finding that, while the Association's charge was, in fact, timely, the Policy was a matter of

---

[6] Section 1201(a)(1) prohibits public employers from "[i]nterfering, restraining or coercing employes in the exercise of rights" under PERA, 43 P.S. § 1101.1201(a)(1), while Section 1201(a)(5) prohibits public employers from "[r]efusing to bargain collectively in good faith with an employe representative," *id.* § 1101.1201(a)(5).

inherent managerial prerogative which was not subject to mandatory bargaining, and, therefore, the State System did not violate Sections 1201(a)(1) and (5).

Specifically, with regard to the merits of the Association's ULP charge, the Board relied on its prior decision in *State College & University Professional Association, PSEA/NEA v. Pennsylvania State System of Higher Education*, PERA-C-15-299-E, 48 PPER ¶ 88 (Final Order, May 16, 2017) ("*SCUPA*"), noting that, therein, the hearing examiner concluded that the State System's Policy — the same one at issue herein — was a matter of managerial prerogative not subject to mandatory bargaining because the State System's interest in protecting children outweighed the employees' interests with regard to terms and conditions of employment. The Board found that the record in this case revealed no substantial factual difference that would justify deviating from *SCUPA*; hence, the Board determined that the State System's interest in protecting minors on its premises outweighed the faculty's concerns over terms and conditions of employment, including privacy and tenure issues, rendering the Policy not subject to mandatory bargaining. Accordingly, the Board concluded that the State System did not commit a ULP in refusing to bargain over the Policy.

The Association filed a petition for review in the Commonwealth Court, asserting, *inter alia*, that the Board erred in concluding that the State System had the managerial prerogative to impose the CPSL reporting and background check requirements upon now-statutorily-excluded employees, and that the Board misapplied the balancing-of-interests test promulgated by this Court in *Pennsylvania Labor Relations Board v. State College Area School District*, 337 A.2d 262 (Pa. 1975). The Association also averred that

the Board neglected to undertake a case-specific assessment, in accordance with *State College*.

In a unanimous, unpublished memorandum opinion authored by Senior Judge Dan Pellegrini, a three-judge panel of the Commonwealth Court overturned the Board's decision. *APSCUF v. PLRB*, 966 C.D. 2017 (Pa. Cmwlth. filed April 19, 2018). Preliminarily, the court considered the CPSL and its various amendments to narrow what was at issue in the appeal. The court found the relevant inquiry to be whether the Policy's criminal background check and reporting requirements for the now-statutorily-excluded employees was a mandatory subject of bargaining or a managerial prerogative. The court observed that, pursuant to *State College*, it was required to "determine whether the impact of the issue on the interest of the employe in wages, hours, and terms and conditions of employment outweighs its probable effect on the basic policy of the system as a whole." *Id.* at 13-14 (quoting *State College*, 337 A.2d at 268). The court noted that, in weighing the interests, "the paramount concern must be the public interest in providing for the effective and efficient performance of the public service in question." *Id.* at 14 (quoting *State College*, 337 A.2d at 268). The court found further guidance from this Court's more recent decision in *Borough of Ellwood City v. Pennsylvania Labor Relations Board*, 998 A.2d 589, 600 (Pa. 2010) (holding that, in the context of Act 111 and the Pennsylvania Labor Relations Act, *infra*, a topic is considered to be a non-bargainable managerial prerogative if "collective bargaining over the topic would unduly infringe upon the public employer's essential managerial responsibilities").

Turning to the facts of the instant matter, the court opined that the background check and reporting requirements imposed on the now-statutorily-excluded faculty

members via the Policy "directly relate to the terms and conditions of employment," given that, thereunder, "the results can and will be used to make tenure, firing, disciplinary, and other decisions affecting faculty members' teaching ability." *APSCUF*, 966 C.D. 2017, at 15. The court then concluded that collective bargaining over the Policy with respect to the now-statutorily-excluded employees "would not *unduly infringe* upon the State System's purported essential managerial responsibility of protecting students and minors on its university premises, especially in light of the fact that the General Assembly determined those employees are not required to have background checks." *Id.* (emphasis added). The court, thus, determined that the State System was required to bargain over the Policy with respect to the now-statutorily-excluded employees, noting that the Policy's requirements were dissimilar to the "entrepreneurial topics that are more naturally considered to be inherently managerial in nature," such as decisions regarding programs, standards of service, budget, technology, organizational structure, and selection and direction of employees. *Id.* (quoting *Ellwood City*, 998 A.2d at 601 (citing 43 P.S. § 1101.702)). Accordingly, the court reversed the Board's decision and held that the Policy's application to the now-statutorily-excluded employees was a mandatory subject of bargaining. The Board and the State System filed a petition for allowance of appeal with our Court.

Our Court granted allocatur to address whether the Commonwealth Court erred when it reversed the Board's ruling that the Policy's requirements that all employees submit to criminal background checks, and notify their university employers if they are arrested for a serious crime or are the subject of a founded or indicated report of child abuse, constituted a nonbargainable managerial prerogative of the State System.

*APSCUF v. PLRB*, 198 A.3d 1048 (Pa. 2018) (order). An appellate court's review of a decision of the Board is limited to determining whether there has been a violation of constitutional rights, an error of law, or a procedural irregularity, or whether the findings of the agency are supported by substantial evidence. 2 Pa.C.S. § 704. Our scope of review is plenary in that we can consider the entire record. *Lancaster County v. PLRB*, 94 A.3d 979, 986 (Pa. 2014).

Before us, the State System first offers that the *State College* balancing inquiry is the appropriate standard by which to evaluate an employer's duty to bargain over a claimed managerial prerogative. It goes on to assert that it has a legitimate managerial interest in protecting children on its campuses and in ensuring compliance with the CPSL, and that both of these functions are served through the application of the Policy to all employees. The State System posits several hypothetical scenarios, which it argues would place it, its administrators, and its faculty members in violation of the CPSL. It asserts that a uniform policy avoids the situation where a faculty member who did not have a background check is placed into a class with a non-matriculated minor. Specifically, the State System contends that the "logistics in course development, course enrollment, and the substitution of faculty members during short-term absences, all illustrate why there is a need for a uniform policy for background checks applicable to all employees." State System's Brief at 28. Elaborating on this notion, the State System highlights that a faculty member cleared to interact with non-matriculated minors[7] may be

---

[7] The State System explains that non-matriculated minors are high school students who are "permitted to enroll in specific university courses, but [are] not enrolled in a degree program," and may also be referred to as "dual-enrolled" minors. State System's Brief at 27 n.8.

absent from class due to an illness or unexpected emergency, in which case the relevant department chair would assign another faculty member to cover the absent faculty member's classes. Because the department chairs, who are bargaining unit members, do not know, due to privacy and confidentiality concerns, which faculty members are permitted to interact with non-matriculated minors, the State System postulates that the department chair may assign an employee without the appropriate clearances to cover the class in which non-matriculated minors are enrolled, in violation of the CPSL. According to the State System, the administration, which does not include department chairpersons who are represented by the Association, often remains uninvolved in the process of assigning coverage for short-term absences.

The State System further notes that the add/drop period for enrollment continues for a full week after the beginning of classes, and that it may take four to six weeks for a faculty member to obtain all necessary clearances to permit them to interact with non-matriculated minors under the CPSL. In the State System's view, this means that a faculty member who is expecting to teach a class in which no non-matriculated minors are enrolled may suddenly have a new non-matriculated minor enrolled in the class during the add/drop period, when the faculty member has not obtained the necessary clearances. The State System argues that these scenarios expose its administrators to criminal penalties based on 23 Pa.C.S. § 6344(b.2) ("An employer, administrator, supervisor or other person responsible for employment decisions that intentionally fails to require an applicant to submit the required documentation before the applicant's hiring or upon recertification commits a misdemeanor of the third degree."). With respect to the self-reporting requirement for faculty members arrested for or convicted of certain criminal

offenses, the State System also claims that the administration needs to know such information so that it may assess the level of the risk of harm that a faculty member with a criminal record poses to students and other employees.

The State System explains that the Board properly recognized its legitimate managerial interests in protecting students and minors present at its universities for various reasons, and asserts that its interests in this regard are uniform across all categories of employees, including, *inter alia*, faculty, administrators, and non-faculty staff. It highlights, as noted above, numerous programs offered at its universities to demonstrate that minors are often present on its properties. It maintains that these and other programs are intended to enrich the communities in which the universities are located and to entice local youth to attend those universities upon graduating high school.

Additionally, the State System contends that the Board properly relied upon *SCUPA* in reaching its ultimate decision because the facts and circumstances therein were essentially identical to the instant matter, including that *SCUPA* involved the same Policy. Thus, it concludes that the Commonwealth Court erred in reversing the Board's decision, neglecting to accord the appropriate deference to the Board's findings. Specifically, the State System notes that the court gave little regard to the fact that the Board had previously upheld the State System's managerial prerogative with respect to the Policy in reviewing a nearly identical ULP charge. The State System asserts that the Board was not clearly erroneous in twice upholding the Policy as an exercise of managerial prerogative, but, instead, acted within its authority, whereas the Commonwealth Court, in the State System's opinion, exceeded its authority by overturning the Board's prudent decision.

The State System further offers that the Commonwealth Court and the Board have both previously found policies similar to that which is currently at issue to be within an employer's managerial prerogative, including *AFSCME, Council 13 v. Pennsylvania Labor Relations Board*, 479 A.2d 683 (Pa. Cmwlth. 1984) (finding that a Code of Conduct which included procedures for employees charged with or convicted of a criminal offense was a topic of inherent managerial prerogative); *AFSCME, Council 13 v. Pennsylvania Department of Transportation*, 21 PPER ¶ 21108, 1990 WL 10611714 (Proposed Decision & Order, May 25, 1990) (concluding that a rule imposing discipline for criminal convictions and arrests was consistent with the Commonwealth Court's decision in *AFSCME* and, thus, not subject to mandatory bargaining); and *Fraternal Order of Police Lodge No. 9 v. City of Reading*, 34 PPER ¶ 34, 2003 WL 26073073 (Proposed Decision & Order, Mar. 10, 2003) (holding that a department rule requiring officers to report arrests was a proper exercise of managerial prerogative).

The State System asserts, moreover, that the Commonwealth Court "improperly imported" the "unduly infringe" language from *Ellwood City* into this case, given that the issue presented in *Ellwood City* arose under Act 111[8] (granting collective bargaining for, *inter alia*, police and fire personnel) rather than PERA, noting that Act 111 does not specifically include a provision excluding matters of inherent managerial policy from negotiations as does PERA in Section 702, discussed *infra*. State System's Brief at 39. Instead, the State System contends that the court should have adhered to the *State College* balancing test to determine whether "the impact of the issue on the interest of the employee in wages, hours and terms and conditions of employment outweighs its

---

[8] Act of June 24, 1968, P.L. 237, No. 111 (as amended, 43 P.S. §§ 217.1 to 217.10).

probable effect on the basic policy of the system as a whole." *Id.* at 40 (quoting *State College*, 337 A.2d at 268). The State System submits that the court used the wrong standard, came to the wrong conclusion, and mischaracterized the practical purpose of the Policy. More specifically, it claims that the requirements contained therein merely oblige employees to furnish the administration with information it, in the past, has obtained through other means, such as news reports, anonymous tips, or word of mouth. The State System maintains that, regardless of the means by which it obtains information related to a faculty member's arrest or conviction for a criminal offense, its response is consistent: it looks to the "severity, recency and relevancy" of the arrest or conviction and determines whether the arrest or conviction was connected "to the individual's duties and responsibilities." *Id.* at 41. Thus, according to the State System, the Policy merely provides a more reliable procedure for obtaining what it views as relevant information about its employees. Moreover, it notes that, even if the Policy does enhance its knowledge about faculty members' criminal encounters and potentially could result in negative employment action, faculty members remain entitled to challenge any such action by way of the collectively-bargained-for grievance procedure. Accordingly, the State System seeks reversal of the Commonwealth Court's decision.

Consistent with the State System's position, the Board[9] notes that *State College* provides the correct standard for determining whether a topic implicates wages, hours, or terms and conditions of employment under Section 701 of PERA, *infra*, or falls within the purview of Section 702 and constitutes a matter of inherent managerial policy not subject

---

[9] The Board is a party in this appeal fulfilling its role of enforcing the Commonwealth's labor laws. *See* 43 P.S. §§ 1101.501, 1101.1501.

to mandatory bargaining. The Board contends that it properly applied the *State College* balancing test, weighing the faculty members' interests in job security, tenure, discipline, and privacy against the State System's interests in providing a safe and effective system of higher education, and appropriately concluded that "the preponderance of the interests tipped the balance in favor of a managerial prerogative, such that [the State System's] interests in obtaining background clearances of faculty and requiring them to report criminal arrests or findings of child abuse, outweighed the faculty interests in wages, hours and working conditions." Board's Brief at 23-24. According to the Board, in overturning its decision, the Commonwealth Court failed to adhere to the *State College* balancing test, instead reformulating the test to include *Ellwood City's* "unduly infringe" standard. *Id.* at 20.

The Board explains that it explicitly found that the State System enacted the Policy "in furtherance of a safe environment on campus" in which it could effectively provide higher education to students. *Id.* at 24. The Board continues that the State System's interest in campus safety was the same in *SCUPA*, and claims that the Board, therefore, did not "need to 'reinvent the wheel'" in addressing the bargainability of the Policy in this instance. Rather, the Board asserts that it was merely required to factor in additional considerations presented by the parties in undertaking the *State College* analysis. *Id.* at 24-25 n.3. Here, the Board maintains that it considered all relevant interests raised by the parties and found that the State System's interests in protecting its students from harm went to the heart of its function in providing higher education, and outweighed the Association's concerns regarding discipline, privacy, job security, promotion, and tenure.

Thus, the Board asks that this Court reverse the Commonwealth Court's decision and reinstate its final order.

In response to the State System and the Board, the Association argues that the Commonwealth Court's ruling is consistent with the General Assembly's intent to exclude the majority of university faculty from the CPSL requirements, as evinced by the Act 15 amendments. The Association claims that the Court must look to the relevant public interests served both by the CPSL and by the State System's enabling legislation to discern the nature of the Policy. First, the Association notes that the legislature expanded mandatory background checking and reporting requirements under the CPSL with the enactment of Act 153, which resulted in nearly all faculty members needing to adhere to those standards. However, the Association adds that, when the legislature passed Act 15 shortly thereafter, it drastically narrowed the scope of the requirements, expressly excluding most of the State System's faculty, thus, indicating that the legislature intended "to create 'two classes of faculty based upon exposure to minors and potential risk of abuse. . . .'" Association's Brief at 24 (quoting *PASSHE (Lock Haven Univ.) v. APSCUF*, 193 A.3d 486, 497 (Pa. Cmwlth. 2018)). The Association offers that Act 15 rendered the requirements promulgated by Act 153 inapplicable to faculty with no direct contact with children, who do not volunteer for extracurricular activities and programs with children, and who do not teach dual-enrolled high school students in the classroom. Essentially, the Association contends that the changes to the CPSL made by Act 15 definitively establish that the legislature found the background checking and reporting requirements of Act 153 to be "excessive and unnecessary to protect children from abuse in higher education settings." *Id.* at 24. In the Association's view, the Board failed to acknowledge

the legislature's intent in this regard, and compounded its error by failing to recognize that nothing in the CPSL prohibits collective bargaining over similar employment requirements beyond what is statutorily mandated.

Turning to the State System's interests, the Association highlights that Section 20-2003-A of the Public School Code of 1949, as amended, provides the essential public function of the State System:

> The primary mission of the system is the provision of instruction for undergraduate and graduate students to and beyond the master's degree in the liberal arts and sciences and in applied fields, including the teaching profession.

24 P.S. § 20-2003-A(a). The Association suggests that the Board neglected to address this express purpose of the State System, instead determining that providing services to minors is a vital function of the State System. The Association claims that the "safeguarding of minors" is "completely unrelated to the primary mission of the State System as a whole," which is to provide undergraduate and graduate instruction to students, and asserts that the "Board could not possibly evaluate the impact of the Policy in any credible way, when it failed to accurately identify the core interests of the State System employer." Association's Brief at 28. Conversely, the Association believes that the Commonwealth Court did, in fact, undertake an appropriate analysis of these issues, ultimately reaching the correct conclusion that the requirements contained in the Policy were unlike the core entrepreneurial functions that unquestionably constitute matters of inherent managerial prerogative, such as issues involving programs, budget, and organizational structure.

The Association argues that there is no evidence that the Policy, as imposed upon the now-statutorily-excluded employees, has any impact on campus safety, and accuses

the State System of promulgating the Policy merely as a "symbolic gesture to dissociate [the State System] with the scandal at Penn State." *Id.* at 32. The Association asserts, as did the Commonwealth Court, that a background check of Jerry Sandusky would have returned a "clear" report and, thus, would not have alerted his employer of his proclivity for sexually abusing children. Similarly, the Association maintains that imposing the Policy upon the now-statutorily-excluded employees will have "zero" impact upon the State System's interest in providing undergraduate and graduate education, but will significantly impact the working conditions of the faculty members. Hence, the Association submits that the Policy must be bargained before implementation, otherwise the now-statutorily-excluded employees will be required to "reveal a lifetime of run-ins with the law and risk summary discipline and/or termination," noting that one faculty member has already been terminated due to a disqualifying conviction nearly three decades old. *Id.* at 34. Moreover, the Association contends that any number of administrators could gain access to the disclosed information and that it could be used in future tenure and promotion decisions.

Additionally, the Association claims that the hypothetical situations posited by the State System are meritless, given that the university employer enjoys complete control over course registration and could easily program its computer system to limit enrollment for each class to students born after a certain date. Further, the Association highlights that there is no evidence that non-matriculated minors have ever attended a new class unexpectedly during the add/drop period. According to the Association, the courses in which they may enroll are highly limited under various memorandums of understanding between each participating high school and college, rendering it highly improbable that

neither the university registrar nor the high school guidance counselor would be unaware of scheduling changes. Likewise, the Association offers that the State System's concern over class coverage for faculty absences is unfounded because: a faculty member's brief coverage of a class in which a non-matriculated minor is present is not the type of "routine interaction" with children proscribed by the CPSL;[10] the CPSL permits a 90-day provisional period in which to conduct background checks;[11] and unplanned absences exceeding one week require administrative approval by the Dean or other authority figure higher in the chain of command. The Association also notes that administrators will not be subject to criminal prosecution for brief periods of substitute coverage, as alleged by the State System, because criminal liability attaches under the CPSL only where the administrator "intentionally fails" to comply.[12] Thus, the Association argues that the State System's interests in uniformly imposing child protection obligations on the now-statutorily-excluded employees are "speculative and fail to overcome the interests of [these excluded] employees." *Id.* at 43.

Lastly, the Association focuses on the Commonwealth Court's use of *Ellwood City*'s "unduly infringe" language in its decision, offering that the rulings in *Ellwood City* and *State College* are consistent, and, in fact, that the former was derived from the latter. On this basis, the Association maintains that the Commonwealth Court did not err in seeking guidance from *Ellwood City* in balancing the parties' interests, suggesting that "an application of either test produces the same result." *Id.* at 46. Specifically, the

---

[10] 23 Pa.C.S. § 6303.

[11] 23 Pa.C.S. § 6344(m).

[12] 23 Pa.C.S. § 6344(b.2).

Association contends that the Policy implicates the terms and conditions of employment regardless of the standard used by the court. Further, the Association submits that the State System's primary mission is to provide higher education to undergraduate and graduate students — a fact which it contends is constant under either standard. Finally, the Association urges that the Commonwealth Court's use of the *Ellwood City* language did not alter the outcome of the case, as it believes that the interests of the faculty members outweighs those of the State System regardless of which case is considered to be controlling. *Id.* at 48. Accordingly, the Association requests that the court's decision be affirmed.

Our analysis of the parties' arguments and the delineation of those matters that are subject to the right of collective bargaining as set forth in PERA raises a question of statutory construction; thus, our consideration must be guided by the Statutory Construction Act of 1972 (the "Statutory Construction Act"). 1 Pa.C.S. § 1501 *et seq*. Under the Statutory Construction Act, it is fundamental that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." *Id.* § 1921(a). The Act provides that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." *Id.* § 1921(b).

Guided by these principles, we first observe that, as a general matter, public entities subjected to PERA make a variety of decisions in fulfilling their mission. Certain of these decisions relate to the formulation and implementation of policies. Other decisions go to the relationship between the public entities and the individuals that they employ. With respect to these decisions, as detailed below, certain topics under PERA

are considered to be mandatory subjects of bargaining, others are considered to be permissive or voluntary subjects of bargaining, and, finally, certain matters are not permitted to be bargained at all, as they are deemed to be illegal subjects of bargaining.

Thus, the General Assembly in PERA did not purport to subject every decision a public employer makes to collective bargaining. In determining whether matters fall within the scope of collective bargaining, Article VII of PERA offers express guidance. Section 701 therein provides:

> Collective bargaining is the performance of the mutual obligation of the public employer and the representative of the public employes to meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment, or the negotiation of an agreement or any question arising thereunder and the execution of a written contract incorporating any agreement reached but such obligation does not compel either party to agree to a proposal or require the making of a concession.

*Id.* § 1101.701. Thus, under Section 701, public employers must collectively bargain with employee representatives over wages, hours, and other terms and conditions of employment.

At the same time, and in light of the very same considerations, it is equally apparent that the General Assembly had no intention or expectation that the collective bargaining process would permit public employees to set matters of public policy or participate with their public employer in administering the public enterprise. The right to collective bargaining as to "wages, hours and other terms and conditions of employment" is not unlimited, as Section 702 unambiguously provides that a public employer is not required to bargain if the topic is one of inherent managerial policy. Specifically, Section 702 explains:

> Public employers shall not be required to bargain over matters
> of inherent managerial policy, which shall include but shall not
> be limited to such areas of discretion or policy as the functions
> and programs of the public employer, standards of services,
> its overall budget, utilization of technology, the organizational
> structure and selection and direction of personnel. Public
> employers, however, shall be required to meet and discuss on
> policy matters affecting wages, hours and terms and
> conditions of employment as well as the impact thereon upon
> request by public employe representatives.

*Id.* § 1101.702. Thus, pursuant to Section 702, a public employer is not *required* to collectively bargain over matters of "inherent managerial policy" — also referred to as managerial prerogatives — as these matters are reserved for the employer's unilateral decision-making. The public employer may, however, negotiate over these matters on a permissive basis. By Section 702, the General Assembly has broadly indicated what it deems to be examples of inherently managerial matters, identifying programming, standards of service, budgetary matters, organizational structure, and the selection and direction of personnel.

Finally, Section 703 expressly provides that the parties may not bargain over, and a collective bargaining agreement may not contravene, any legislative mandate. Specifically, Section 703 warns:

> The parties to the collective bargaining process shall not effect
> or implement a provision in a collective bargaining agreement
> if the implementation of that provision would be in violation of,
> or inconsistent with, or in conflict with any statute or statutes
> enacted by the General Assembly of the Commonwealth of
> Pennsylvania or the provisions of municipal home rule charters.

43 P.S. § 1101.703.

In sum, these clear and unambiguous statutory provisions set forth a framework which requires collective bargaining over matters that impact an employee's wages, hours, and terms and conditions of employment. Yet, they also make plain that a public

employer is a public entity responsible to all of our citizens for a number of decisions that concern the public welfare, and decisions that involve an inherent managerial policy are not subject to negotiations. Finally, these provisions prohibit the parties from agreeing upon any term that conflicts with statutory enactments.

As to the process by which the Board and the courts are to determine and reconcile which matters are subject to collective bargaining and which topics are deemed to be inherent managerial policies under PERA, our landmark 1975 decision in *State College* has provided guidance for over 40 years. Writing for the Court, Justice Robert N.C. Nix, Jr. addressed the determination of whether a particular topic is a matter of wages, hours, or working conditions subject to bargaining under Section 701, or an inherent managerial policy of the public employer, and not subject to mandatory bargaining, under Section 702. In determining which matters were bargainable, our Court first recognized the balance between the public employer's significant role in providing effective and efficient public services and the importance of a viable process of collective bargaining to reduce labor strife. Specifically, we noted that:

> A determination of the interrelationship between sections 701 and 702 calls upon us to strike a balance wherein those matters relating directly to 'wages, hours and other terms and conditions of employment' are made mandatory subjects of bargaining and reserving to management those areas that the public sector necessarily requires to be managerial functions.

*State College*, 337 A.2d at 267-68. We recognized that in "striking this balance the paramount concern must be the public interest in providing for the effective and efficient performance of the public service in question." *Id.* at 268. Indeed, appreciating the difficulty of the task, the Court stressed that "[w]e recognize that in many instances the line will be difficult to draw,[ ] however, if we remain ever mindful that our paramount

concern in this area is the public interest, no situation will be insoluble." *Id.* (footnote omitted). In focusing on the balancing inquiry, the *State College* Court recognized the reality that some matters which are of prime concern to employees' wages, hours, or terms and conditions of employment may, at the same time, directly implicate, or at least touch upon, basic public employer policy. Indeed, an employer's policy decisions almost invariably implicate, to some degree, the employer-employee relationship.

With its primary focus on the public interest, the Court went on to offer a test, to be applied on a case-by-case basis, weighing a given matter's impact on the interest of the employee against the effect on the employer's basic policy determinations:

> [W]e hold that where an item of dispute is a matter of fundamental concern to the employes' interest in wages, hours and other terms and conditions of employment, it is not removed as a matter subject to good faith bargaining under section 701 simply because it may touch upon basic policy. It is the duty of the Board in the first instance and the courts thereafter to determine whether the impact of the issue on the interest of the employe in wages, hours and terms and conditions of employment outweighs its probable effect on the basic policy of the system as a whole.

*Id.*

Thus, in determining whether a topic is subject to collective bargaining, the Board in the first instance, and then the courts, must consider the relative weight of the impacted interest of the public employee in wages, hours, and conditions of employment against the public employer's impacted interest in basic policy matters concerning the employer's operations, and then assess which interest predominates.[13] If the impact on the

---

[13] While the Commonwealth Court in this matter, after citing our decision in *State College*, nevertheless went on to apply Act 111's "unduly infringe" standard, *Borough of Ellwood City*, we believe the application of that standard in this matter was erroneous, as such test seemingly represents a more employee-favorable standard, perhaps explained by

employees' interest in wages, hours, and conditions of employment outweighs the employer's concerns about restrictions on its basic policy choices, the proposal is considered a mandatory subject of bargaining. If, however, the latter outweighs the former, such topic shall be deemed to constitute an inherent managerial prerogative and be insulated from the give-and-take of mandatory collective bargaining. Nevertheless, under Section 702, the public employer shall, at least, meet about and discuss such topics upon request by the public employee's representative. *Id.*

Before we apply the *State College* construct, we recognize that the parties focus much of their argument on the CPSL and its amendments. While statutory law may inform whether a topic is a mandatory subject of bargaining, the question of whether a matter is subject to mandatory bargaining is generally a jurisprudential question for the courts based upon our case law and the underlying policies at issue. *State College*. On one hand, as we noted in *State College*, the mere fact that a particular subject matter may be covered by legislation does not remove it from collective bargaining under Section 701 if it bears on the question of wages, hours, and conditions of employment. *Id.* at 269. Moreover, as set forth above, Section 703 bars only CBA terms that violate or are inconsistent with statutory directives. Yet, we find no suggestion that the General Assembly intended that a topic which is removed from legislative direction is *ipso facto* a mandatory subject of bargaining. Rather, in our view, a public employer may act on a matter that is an inherent managerial policy if the legislature has not addressed, or no

---

Act 111 employees' inability to engage in a strike, 43 P.S. § 215.2. Thus, to the extent the applicable standard is an open question, we reaffirm the *State College* "balancing test" for questions regarding bargaining topics arising under PERA.

longer addresses, that topic. Here, there is no express or implicit indication in the CPSL that the legislature intended to bar a conclusion that the subject matter implicated by the Policy is an inherent managerial policy.[14]

With this perspective, we now apply the approach set forth in *State College* to the matter at hand. As noted above, we must first inquire whether the Policy's requirements impact the faculty members' wages, hours, and other terms and conditions of employment. 43 P.S. § 1101.701. We conclude they clearly do.

The criminal background reports and ongoing arrest and conviction notification requirements are required for continued employment, as they are mandatory for both new and existing faculty members. Moreover, the revelation of an arrest, conviction, or evidence of child abuse could subject the faculty member to an investigation, and could potentially result in discipline or termination. Thus, we have no difficulty in concluding that the Policy requirements implicate fundamental interests of faculty members in their terms and conditions of employment.

We must next consider whether the Policy — requiring submission to criminal background checks and the reporting of arrests or convictions of a serious crime, or the finding or indication of child abuse — implicates a basic policy matter concerning the

---

[14] We acknowledge that Section 6344.3 of the CPSL cautions that the requirements in the CPSL shall not interfere with an employer's prerogative to make employment decisions regarding, or to discipline or terminate, an employee, and does not impact the ability of an employer to impose additional hiring or selection standards. 23 Pa.C.S. § 6344.3(e) ("Nothing in this chapter shall be construed to otherwise interfere with the ability of an employer or person responsible for a program, activity or service to make employment, discipline or termination decisions or from establishing additional standards as part of the hiring or selection process for employees or volunteers."). Thus, this section, in essence, acts as a floor above which an employer may require additional clearance and reporting obligations. Yet, this section does not address whether such additional requirements are mandatory subjects of bargaining.

public employer's operations. First, we recognize that the stated purpose of the State System is to provide "high quality education at the lowest possible cost to the students." 24 P.S. § 20-2003-A. Indeed, the "primary mission of the system is the provision of instruction for undergraduate and graduate students . . . in the liberal arts and sciences and in applied fields, including the teaching profession." *Id.* Contrary to the Association's assertion that the "safeguarding of minors" is "completely unrelated to the primary mission of the State System as a whole," Association's Brief at 28, we find that the safety of the minors who participate in the university system is a core aspect of the State System's primary mission of providing instruction. Manifestly, the Policy serves the State System's vital interest in protecting the safety of minors on university campuses by informing the university administration about the existence of, *inter alia*, felony child sex offenders, and generally whether employees have had interactions with the criminal justice system — information necessary for the proper functioning of each university. Indeed, requiring the disclosure of criminal background, arrest, conviction, and child abuse information is foundationally related to not only the protection of minors, but to all students. Furthermore, and more broadly, we find that the Policy impacts the integrity of the State System's workforce and the public's respect for the State System. Moreover, we view the Policy's requirements as akin to those functions — such as programming, standards of service, and the direction of personnel — which indisputably lie at the core of management control, impacting foundational policy matters. Accordingly, we have no hesitation in concluding that the Policy, and its requirements for disclosing criminal history information and child abuse findings, implicates basic policy matters concerning the public employer's operations.

Thus, we are faced with a situation in which the topic at issue both impacts the employees' working conditions and implicates basic policy. That being the case, and consistent with the teachings of *State College*, we must weigh the impact on the faculty's interest in the terms and conditions of their employment against the impact on the State System's basic policy-making. We certainly do not discount the effect on the faculty of mandated disclosures of criminal history information and child abuse findings to a university employer. Indeed, such disclosures, as noted above, could lead to discipline and termination. The difficulty is that permitting bargaining over such disclosure mandates, and, thus, potentially narrowing or eliminating the requirements, could limit the universities' knowledge of such vital information, undermining the State System's ability to fulfill its essential obligation to protect minors — and, indeed, all students — who are on its campuses. Again, we view the safety of children to be a vital part of the State System's core mission of providing instruction and education. Mindful that the paramount concern in this inquiry is the public interest, *State College*, 337 A.2d at 268, we hold that the impact of the Policy on faculty members' terms and conditions of employment does not outweigh the State System's interest in its foundational policy of protecting minors who are on campus and providing a safe educational environment. Accordingly, we conclude that the Policy constitutes an inherent managerial policy over which the State System is not required to bargain. 43 P.S. § 1101.702. On that basis, we reverse the Commonwealth Court.[15]

---

[15] While we have determined that the Policy is not subject to collective bargaining, we emphasize that the consequences of a disclosure of criminal activity or child abuse finding, such as disciplinary action or termination, are beyond the purview of the Policy. The Policy is only an information-gathering mandate. The State System concedes that

Order reversed.

Chief Justice Saylor and Justices Baer, Donohue, Wecht and Mundy join the opinion.

Justice Dougherty files a dissenting opinion.

---

any disciplinary actions resulting from the disclosure of criminal activity or child abuse findings would be subject to the just-cause provision of the CBA. Related thereto, associated questions and concerns, such as the confidentiality of and access to criminal history information, retention of background clearances, and payment for background clearances, may be subject to impact bargaining, and, indeed, it appears that the State System has been willing to engage in such negotiations.